777 So.2d 600 (2000)
STATE of Louisiana
v.
Johnny MOORE.
No. 99-KA-2684.
Court of Appeal of Louisiana, Fourth Circuit.
December 20, 2000.
*602 Hon. Harry F. Connick, District Attorney of Orleans Parish, William L. Jones, III, Assistant District Attorney of Orleans Parish, Jane L. Beebe, Assistant District Attorney of Orleans Parish, New Orleans, LA, Attorneys for Plaintiff/Appellee.
Katherine M. Franks, Louisiana Appellate Project, Baton Rouge, LA, Attorney for Defendant/Appellant.
Court composed of Judge PLOTKIN, Judge WALTZER, Judge McKAY.
McKAY, Judge.

STATEMENT OF THE CASE
On July 16, 1998, appellant Johnny Moore was indicted on a charge of first degree murder. On June 2, 1999, a jury found him guilty of second degree murder. On June 18, 1999, he was sentenced to life imprisonment at hard labor without benefit of probation, parole or suspension of sentence.

STATEMENT OF THE FACTS
At about 12:30 on May 27, 1998, the fire department was called to the scene of a fire in the second floor of a townhouse apartment on Burgundy Street. When the firemen arrived, there was no fire on the first floor, but the fire on the second floor was so intense that they could not enter. After waiting a few minutes for water to charge the line, the firefighters entered the bedroom area of the apartment and put the fire out. As they did so fire captain A.J. McGovern saw a body in the debris; he notified his command, which in turn notified the police department. Capt. McGovern then guarded the body and helped police officers look for evidence.
Capt. McGovern observed a burned shell of a mattress over the upper portion of a burned body. The victim's hands were tied behind his back. The fiber used to tie the victim's hands was saturated with blood. A claw-like hammer and a metal pipe were found underneath the victim. The hammer was badly burned also. Capt. McGovern and arson investigator Thomas St. Germaine testified that they observed "trailers," burn patterns indicating that a fire was set with accelerant. Capt. McGovern explained that a fire ignited with an accelerant leaves darker marks where the accelerant was poured, because the fire is hotter in those areas. Investigator St. Germaine testified that the heat from this particular fire would have been so extreme after it was set that no one could have entered the room.
The parties stipulated that the burned body was identified from x-rays and dental records as William "Willie" Lewis. Dr. William Newman performed the autopsy. He testified that there was extensive charring of the victim's face and extremities. The victim also suffered depressed skull fractures in the back of the head consistent with blows to the head from a hammer. Oral and rectal swabs were negative *603 for seminal fluid. The victim had type 0 blood. There was no soot in the victim's lungs, indicating that he died of the blows to his head prior to being set on fire.
At about the same time that the fire department was called to the fire and only a few blocks away, appellant Johnny Moore was riding a bicycle on North Villere Street when Det. Dan Anderson, who was patrolling with a partner, ordered him to stop. Moore was carrying a heavy duffel bag and a cue stick, and was weaving back and forth, posing a danger to himself and other traffic. After he was stopped, Moore began making threats, stating to Det. Anderson that he had just dropped a gun off, or he would have killed him. Det. Anderson then placed Moore under arrest.
After advising Moore of his rights, Det. Anderson asked him where he got the property in the duffel bag. Moore told him it came from an abandoned house. The officers went with Moore to two locations, but neither location had abandoned property on it. Det. Anderson then relocated to the district station to initiate the paperwork on the threat and another report on lost or stolen property. At trial, Det. Anderson identified the items of clothing and shoes worn by Moore when he was arrested.
Norman Lewis, father of the murder victim, identified the duffel bag and the items inside, including an antique mantel clock, a pocket watch, the cue stick and the bicycle which Moore was riding, as having belonged to his son.
Detective John Riviere was called to the scene of the fire to investigate the fatality for the police department. After observing the scene, he made inquiries among the neighbors, which led him to Rodney Weeden, a handyman who did maintenance work for the victim. Det. Riviere telephoned Weeden, who voluntarily came to the district station for an interview. Because Weeden was a suspect at that time, he was advised of his rights prior to his statement. Through Weeden, Det. Riviere developed a suspect by the name of Johnny Beasley and learned Beasley's address. When Det. Riviere went to that address, the appellant's mother advised him that her son was Johnny Moore, not Johnny Beasley. She further advised Det. Riviere that her son was not home because he was in jail. At that point, Det. Riviere thought he had reached a dead end. However, he ran the appellant's name, date of birth and address through the computer and found out that Moore had been arrested shortly after the fire and only a few blocks away.
Det. Riviere then got a court order to seize the clothes Moore was wearing at his arrest and obtain a sample of Moore's blood. He further obtained an order to seize Moore's shoes, which Moore was still wearing in Parish Prison. Moore and the victim both had type O blood. Accordingly, a swatch of Moore's pants was sent for DNA analysis which indicated that the blood on Moore's pants was from the victim. In addition, Moore's shoes and pants indicated that they were contaminated with a type 3 accelerant consistent with the paint thinner at the victim's home.
When Det. Riviere learned that Moore's pants had type "O" blood on them, the same blood type as the victim, that Moore's shoes and pants were contaminated with mineral spirits, and that the property seized from Moore at his arrest was identified by the victim's family, he had Moore re-booked for murder. He further had Moore brought from Parish Prison to Police Headquarters for questioning. After being advised of his rights, Moore refused to sign the waiver of rights form or make a recorded statement, but made an oral statement to Det. Riviere and Sgt. Kessel.
At first, Moore started crying and said how bad he felt for "Little Willie." After he cried for a few minutes, the officers took a break and got Moore a soft drink. Moore then told them that he went to the location looking for Rodney Weeden. Moore told them that he called for William, who came out with a bloody towel on *604 his head and a black eye. Moore told the officers that he wanted to call the police and get an ambulance, but William told him to take the duffel bag with the property in it to the Villere and Louisa Street area and give it to someone in a green car. Moore further stated that William said he would get medical help when Moore got back after delivering the duffel bag.
At trial, Teddy Fambro, the crime scene technician who worked the scene of the fire, testified that checks for blood, hair and fiber on the hammer, pipe and cloth found near the victim were negative. Fambro further testified that he attempted to obtain fingerprints from various items downstairs in the apartment with no success. He explained that fingerprints were very delicate and often damaged by environmental factors such as extreme heat and moisture.
Criminalist Joe Tafaro testified that there was no identifiable blood or accelerant on Moore's T-shirt. However, he found that Moore's blue jeans, shoes, and debris collected from the kitchen of the fire scene tested positive for accelerant consistent with the can of paint thinner found at the scene.
Officer Ed Delery, an expert in the collection and processing of latent fingerprints, testified that extreme heat would have destroyed any prints on the hammer and the pipe. He further testified that a solvent such as paint thinner could also have destroyed any prints on the outside of the paint thinner can.
At trial, the defense attempted to show that the murder of William Lewis was a signature crime committed by the same people who murdered Johnny Bachemin, a noted musician, only a few blocks away and a few weeks later. Dr. Paul McGarry, who performed the autopsy of Johnny Bachemin, testified that Bachemin also suffered hammer blows to his head. However, Bachemin also had his throat slit, was gagged with his own socks, and was bound around his mouth, legs and feet. Lewis, on the other hand, was not gagged, and only his hands were tied. He was then set on fire.
Det. Dwight Deal testified that he was the lead investigator of the Johnny Bachemin murder. Two males, Travis Johnson and Gary Harrell were arrested in that case. Johnson had already confessed to the Bachemin murder. Harrell and Johnson targeted gay males. They were also suspected of the murder of Curtis Moon in Houma, Louisiana. Like Bachemin, Moon's throat was slit and he was gagged with his own sock. In investigating the whereabouts of Harrell and Johnson, Det. Deal concluded that they were in the Thibodaux area when William Lewis was killed.
At trial, Moore testified that the victim opened up to him and told him personal things. He disagreed with Rodney Weeden, who testified that the victim was not gay. Moore further testified that he was drunk, depressed and desperate for money. He testified that when he got to the victim's apartment, he saw that it was on fire and jumped the fence to see if the victim was all right. Moore further testified that when he saw the victim on fire, he tried to move the mattress off of him and got blood on his hands which he wiped on his pants. Moore confessed to stealing the victim's property as he ran out.

ASSIGNMENT THREEINSUFFICIENT EVIDENCE
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. When the entirety of the evidence both admissible and inadmissible is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must review the assignments of error to determine whether the accused is entitled to a new trial. State v. Hearold, 603 So.2d 731 (La.1992). Thus, although insufficiency of evidence is not the first trial error argued *605 by the appellant, it must be the first considered.
When assessing the sufficiency of evidence to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987). The reviewing court is to consider the record as a whole, and if rational triers of fact could disagree as to the interpretation of the evidence, the rational decision to convict should be upheld. State v. Mussall, 523 So.2d 1305, 1309-10 (La.1988). In applying this standard, the reviewing court must defer to the credibility choices and justifiable inferences of fact made by the jury. State v. Rosiere, 488 So.2d 965, 968 (La.1986); State v. Foy, 439 So.2d 433, 436 (La.1983). The determination of credibility is a question of fact within the sound discretion of the trier of fact and will not be disturbed unless clearly contrary to the evidence. State v. Vessell, 450 So.2d 938, 943 (La.1984).
In the instant case, the appellant was stopped for reckless operation of a bicycle near a busy intersection. He threatened officers and could not adequately explain where he got the duffel bag full of property he was carrying. Investigation of a nearby fire led officers to the appellant as a suspect in the arson and murder of the victim. The appellant's shoes and pants tested positive for the same type of accelerant as the paint thinner can found outside of the subject apartment. Blood from a swatch from the appellant's jeans was a DNA match to the victim's blood. Family members of the victim identified the property seized from the appellant upon his arrest as belonging to the victim. The appellant's testimony was inconsistent with his prior statement. He testified that he entered the apartment to check on William and tried to move the mattress off of him, then stole the items on the first floor on an impulse as he ran out.
The coroner testified that the victim died of blows to the head, not asphyxiation from the fire. An investigating officer testified that the victim's body was discovered under a mattress. A hammer and a pipe were found under the victim's body. Fire experts testified that the fire was the result of arson. Their testimony further indicated that the fire was too hot for the appellant to have entered the second-floor after the victim was on fire, as the appellant testified.
Accordingly, a rational jury could have concluded that there was no other reasonable hypothesis but that the appellant entered the victim's apartment without permission, killed the victim with a blunt object, started the fire to mask the evidence, and stole the victim's property.
The evidence was thus sufficient for a rational jury to find, beyond a reasonable doubt, that the defendant was guilty of second degree murder under either Sec. A(1), "When the offender has a specific intent to kill or inflict great bodily harm," or Sec. A(2)(a), "When the offender is engaged in the perpetration or attempted perpetration of ... aggravated burglary,... (or) armed robbery...."

ASSIGNMENT ONE NON-DISCLOSURE OF BRADY MATERIAL
The appellant argues that the trial judge erred in failing to order the State to produce evidence regarding the murder of Johnny Bachemin to defense counsel in the instant case. The appellant avers that trial counsel established the probability that such evidence was exculpatory in nature and that the State failed to comply with a specific request for exculpatory information made both in "Brady" pleadings and at trial. The appellant further avers that this error impacted the verdict since the State used the evidence in its cross-examination of defense witnesses and in argument, which implied special knowledge of the case to the jury.
*606 The due process clause of the Fourteenth Amendment to the United States Constitution requires the disclosure upon request of evidence which is favorable to the accused when the evidence is material to guilt or punishment. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). This rule has been expanded to include evidence which impeaches the testimony of a witness where the reliability or credibility of the witness may be determinative of guilt or innocence. Giglio v. U.S., 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). "[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial, that is, evidence favorable to the defendant which is material to guilt or punishment." State v. Rosiere, 488 So.2d 965, 970 (La.1986). The test for determining materiality was established in United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). "The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A `reasonable probability' is a probability sufficient to undermine confidence in the outcome." Bagley, 473 U.S. at 682, 105 S.Ct. at 3383.
The defense, in this case, requested the State's entire file on the pending Bachemin case for an in camera inspection. The appellant specifically avers that his direct examination of the lead investigator on the Bachemin case was prejudiced without information from that file. The appellant had specific knowledge, prior to trial, of the similarities of the instant case to the Bachemin case. In addition, the appellant had a copy of the coroner's report from each case, and the identity of the lead investigator of the Bachemin case.
The defense theory was that the murders were signature crimes committed by the same perpetrators. If that were the case, since the appellant had already been arrested and was incarcerated when Bachemin was killed, then the appellant could not have been the perpetrator in the instant case. The defense thus attempted to show that the two murders were related. The evidence indicates that the murders were committed within a few blocks of each other and within a few weeks of each other. Both cases involved robbery and blows to the head with a blunt instrument. Both cases involved arson. Beyond those similarities, the facts differed substantially.
In the instant case, victim William Lewis's hands were bound with cord and fabric. Bachemin was bound at the knees and ankles with wire. Lewis was struck in the back of the head. Bachemin was struck in the face with enough force to cause fracturing. The Bachemin murder was a signature crime, related to the murder of Curtis Moon, not William Lewis. Victims Bachemin and Moon were each found gagged with a sock and with a slit throat. The perpetrators intended for their bodies to be discovered with this signature. Lewis's body was set on fire, also burning the upper floor of his apartment. His throat was not slashed, nor was there evidence of cuts anywhere on his body, though the fire might have destroyed evidence of superficial cuts. Bachemin's vehicle was set on fire after it was used for an escape.
The appellant, by his own testimony, attempted to show that Lewis's murder was related to a string of murders of homosexuals or apparent homosexuals; however, State witnesses disputed the contention that Lewis was a homosexual. Lastly, the investigating officer on the Bachemin case determined that the perpetrators in that case were not even in the New Orleans area on the day of the instant murder.
Accordingly, the evidence relative to the Bachemin murder was not exculpatory. Rather, the additional evidence merely indicated the distinctions in the two cases. This assignment is without merit.

*607 ASSIGNMENT TWO ERRONEOUS ADMISSION OF EVIDENCE

The appellant argues that the trial court erred in permitting photographs made by the arson investigators which had not been disclosed during discovery to be introduced into evidence. He further avers that the introduction of the photographs without notice was not harmless because it negated the defense's theory that the fire was so intense as to have prevented Johnny Moore from ascending to the second floor and ascertaining that William Lewis was already dead before he took items from the ground floor of the apartment.
La.C.Cr.P. art. 718 provides that, upon motion of the defendant, the court must order a law enforcement agency to permit the defendant to inspect, copy or otherwise reproduce photographs and documents which are in the possession of the State and which the State intends to use as evidence at the trial. La.C.Cr.P. art. 729.3 requires a party to promptly notify the other party and the court of the existence of additional evidence discovered after compliance with an earlier discovery order. La.C.Cr.P. art. 729.5 provides permissive sanctions for the failure of a party to comply with the rules of discovery or a court order issued pursuant to those rules. The latter article provides that, if such noncompliance is brought to the attention of the court, "the court may order such party to permit the discovery or inspection, grant a continuance, order a mistrial on motion of the defendant, prohibit the party from introducing into evidence the subject matter not disclosed, or enter such other order, other than dismissal, as may be appropriate."
In the instant case, appellant counsel filed general discovery motions, which included a request for photographs and other documents which the State intended to use as evidence at trial. The State complied by providing appellant counsel with crime scene photographs taken by police department personnel. When arson investigator Thomas St. Germaine took the stand, the State submitted to the defense, for the first time, photographs depicting the pour pattern of the accelerant. Defense counsel objected to the admission of the fire department photographs based on the lack of notice. The court permitted defense counsel to take as much time as he needed to review the photographs, but permitted their admission into evidence.[1]
Appellant now argues that this surprise evidence was prejudicial to his defense that he went upstairs to try to help the victim. As noted by the State, two arson investigation experts testified that the burn patterns on the second floor of the apartment indicated a large amount of accelerant was used, making a very hot fire unlikely to cool down sufficiently for a person to enter the room. The photographs merely supplemented the verbal testimony of two experienced and credible fire department veterans.
By contrast, the appellant's testimony would have been incredible with or without the photographs. The appellant told arresting officers that he obtained the property in the duffel bag from an abandoned house. Upon rebooking for murder, he told other officers that he went to William's apartment looking for a job. He further stated that William came out holding a bloody towel to his head and asked him to deliver the duffel bag of items to someone in a green car. At trial, he testified that he walked through an open gate when he saw smoke and realized that William's house was on fire. He further testified that, after he saw the victim was on fire and tried to move the burning mattress, *608 he knowingly stole the bicycle and other property.
Finally, the appellant fails to proffer any other defense he might have used had he known that his theory would be negated by the testimony and supporting photographs of the arson investigation experts.
Accordingly, considering that the evidence was merely supplemental to the experts' testimony, the appellant's testimony was inconsistent with his two prior statements, and further considering that the appellant suggests no plausible alternative defense, any error in the admission of the photographs was harmless.

ASSIGNMENT FOUR ERRORS PATENT REVIEW
A review of the record for errors patent indicates that there were none. However, appellant avers that the trial court committed an error patent by its failure to advise appellant at sentencing of the two-year prescriptive period for applying for post conviction relief. The Louisiana Supreme Court has held that La. C.Cr.P. art. 930.8(C) is supplicatory language and does not bestow an enforceable right upon an individual defendant. State ex rel. Glover, 93-2330, 94-2101, 94-2197, (La.9/5/95), 660 So.2d 1189. See also, State v. Guy, 95-0899 (La.App. 4 Cir. 1/31/96), 669 So.2d 517, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102. Thus, the trial court's failure to advise the defendant of the limitations period requires no action by this court.
CONCLUSION
Accordingly, we affirm the defendant's conviction and sentence.
AFFIRMED.
NOTES
[1] The appellant avers that the prosecutor had foreknowledge of the additional photographs. The appellant, intentionally or not, misstates the transcript on this issue. As correctly noted by the State in its response, the prosecutor used the term "previously marked" when referring to the police department photographs, and stated "I'm marking as S-22 in Globo," when referring to the fire department photographs.