SUSAN M. CHEHARDY, Chief Judge.
|2On appeal, defendant seeks review of his conviction for second degree murder and life sentence. For the following rea *372 sons, we affirm his conviction and sentence.

Procedural History

This matter has an extensive procedural history. On August 29, 1996, defendant, Allen Snyder, was convicted by a twelve-member jury of first degree murder and subsequently sentenced to death. Defendant appealed his conviction. In 1999, the Supreme Court of Louisiana conditionally affirmed his conviction and sentence but remanded for a “nunc pro tunc hearing to determine whether defendant was competent at the time of his trial.”[1]
On October 26, 2000, after a hearing as ordered by the Louisiana Supreme Court, the district court ruled that, “Based on the evidence taken as a whole, the Court finds that the defendant was competent on the date of his trial.”[2] On April 14, 2004, the Louisiana Supreme Court affirmed.[3]
|3In 2005, the United States Supreme Court granted defendant’s petition for a writ of certiorari, vacated the judgment, and remanded the case to the Louisiana Supreme Court for consideration of defendant’s Batson[4] claims, in light of Miller-El v. Dretke, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005).[5] On remand, the Louisiana Supreme Court found no merit in defendant’s claim that the State excused potential jurors in a racially discriminatory manner and again affirmed defendant’s conviction and sentence.[6]
The United States Supreme Court again granted petitioner’s writ of certiorari.[7] In Snyder v. Louisiana, 552 U.S. 472, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008), the United States Supreme Court held that the trial judge committed clear error in rejecting defendant’s claim that the prosecution exercised peremptory challenges based on race, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which required reversal and remand of the matter to the Louisiana Supreme Court. Thereafter, the Louisiana Supreme Court remanded the matter to the district court for “further proceedings in accord with the law.”[8]
On January 29, 2009, a Jefferson Parish Grand Jury indicted defendant on one count of second degree murder, in violation of La. R.S. 14:30.1, for the homicide of Howard Wilson. On February 12, 2009, defendant pled not guilty. Subsequently, the State filed Notices of Intent to Use Evidence of Other Crimes. On May 4, 2010, a Prieur[9] hearing was held. On May 27, 2010, the trial court |4granted the State’s motion. Defendant sought review of that ruling in this Court, which denied relief.[10]
On January 31, 2012, trial of this matter commenced. After a three-day trial, a *373 twelve-member jury found defendant guilty as charged on February 2, 2012. On March 1, 2012, the trial judge heard and denied numerous post-trial motions. That same day, after defendant waived the statutory delays, the trial court sentenced defendant, as statutorily mandated, to life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. Defendant timely filed a Motion for Appeal, which was granted on March 5, 2012. This appeal follows.

Facts

In 1995, Allen Snyder and his then-wife, Mary Beth, had a troubled marriage.[11] According to Mary Beth, however, after the birth of their third child, Allen became very controlling and jealous. He would not allow her to speak to other men and prohibited her from leaving the house alone.
Eventually, Allen’s jealousy escalated to physical abuse. Mary Beth testified that, on March 18, 1995, Allen, using his hand, violently shoved her head against the passenger side window of his car, which caused injuries to her face. Mary Beth did not seek medical treatment that night.
About three months later, in May of 1995, Allen struck Mary Beth in the leg with a baseball bat as she lay sleeping. She had a large bruise and limped for about a week. Not long after that incident, Allen drove Mary Beth to an isolated road, opened the trunk of his car, and threatened her that he could do “whatever he wanted to” her and “nobody would ever find” her.
| sThat summer the violence escalated. On the morning of June 11, 1995, Allen “slammed” Mary Beth’s head into the wall of their children’s bedroom, which caused injuries requiring hospitalization.[12] After this instance, which their children witnessed, Mary Beth took their children and went to stay at her parents’ house on Wilker Neal Street in River Ridge.
On June 18, 1995, Allen tried to speak with Mary Beth, but she refused. Later that night, Allen disconnected the electrical box outside Mary Beth’s parents’ home, entered the home, and stabbed Mary Beth nine times in the neck, head, and arms. Mrs. Snyder was treated at the hospital for her injuries.[13]
Approximately two months later, on August 15, 1995, Allen called Mary Beth to discuss reconciliation. Mary Beth agreed to meet with him the following day, telling Allen that she had plans with her cousin that night. Allen, however, wanted to begin their reconciliation that night so he *374 paged Mary Beth numerous times while he waited outside of her cousin’s house, which is less than a block away from Mary Beth’s parents’ house.
In truth, Mary Beth went out with another man, Howard Wilson. Around 1:30 a.m., Howard Wilson drove Mary Beth back to her parents’ house. Allen, who admitted that he was carrying a nine-inch-long knife to “scare” Mary Beth into talking to him, was hiding next to a nearby house and waiting for Mary Beth to return.
|ñNot long after Howard Wilson stopped his car in front of Mary Beth’s parents’ house, Allen yanked open the driver’s side door, leaned over Howard Wilson, and stabbed Mary Beth in the face, which, according to Allen “slowed her down.” Allen then “tussled” with Howard, who “got stabbed” because he floored the ear’s accelerator causing Allen to fall onto Howard during the fight. At some point, Howard Wilson exited his car and stumbled down the street. Allen then got into Wilson’s car and attempted to drive off with Mary Beth, who fought and pled for her life. Almost immediately, however, Allen crashed the car into a nearby fire hydrant then fled.[14]
That night, Gwendolyn Williams was walking home on Wilker Neal Street when she observed a man “stooping down on the side of a trailer” with a knife. She saw the man run from behind the trailer toward a car parked across the street, then open the driver’s door, jump inside, and start “tussling” with the driver. When the driver exited the car, Ms. Williams observed that his “throat was cut.” Then, the car moved forward until it hit a fire hydrant.
According to Ms. Williams, she could hear Mary Beth Snyder, who was inside the car, screaming for help while the man, who she recognized as Mary Beth’s husband, “started cutting on her.” Ms. Williams, who had known Mary Beth for a long time, screamed at the man, who jumped out of the car and fled. Ms. Williams then helped Mary Beth, who was cut “everywhere she could be cut” to her mother’s house and waited for the paramedics and the police to arrive.
Deputy Michael Cooke of the Jefferson Parish Sheriffs Office (“JPSO”) was on patrol when he was dispatched to a “traffic accident” at 312 Wilker Neal Street. When he arrived at the scene, he noticed that a white car had struck a fire 17hydrant. There were no passengers inside the vehicle; however, large amounts of blood were present on the ceiling and dashboard. Deputy Cooke then located Howard Wilson and Mary Beth Snyder, who each had sustained wounds that appeared to be from a sharp instrument, such as a knife. After both victims were determined to be free of weapons, they were rushed to the hospital.
According to medical records that were introduced at trial, Howard Wilson died from exsanguination caused by sharp force injuries inflicted with a double-edged blade. Dr. Susan Garcia, an expert forensic pathologist who performed the autopsy on the victim, testified that Howard Wilson sustained nine sharp force injuries to his upper torso. Of those nine, two wounds, which punctured his lung and opened an artery, were lethal. The manner of Mr. *375 Wilson’s death was homicide.[15]
Meanwhile, as a result of investigation, Allen Snyder, defendant herein, was developed as a suspect. Approximately 12 hours later, defendant called the police claiming that he “cut some people and that he was considering suicide,” and requested that an officer be sent to his house.
Officer Vic Giglio of the Kenner Police Department was dispatched to 508 Hanson Street, in Kenner, in response to the call. Defendant allowed Officer Giglio to enter his house then retreated to another room in the house, where he continued to speak with the dispatcher. Defendant did not have any visible injuries. Almost immediately, Sergeant Giglio realized that defendant was wanted for questioning regarding the homicide on Wilker Neal so he detained defendant for the Jefferson Parish Sheriffs Office.
| ^Detective Debbie Labit of the JPSO arrived at defendant’s home and advised him of his Miranda[16] rights. She observed injuries to defendant’s right hand, which appeared to be fresh and “indicative of offensive-type of injuries during an altercation where a knife is used.” Detective Labit had defendant transported to the Detective’s Bureau, where defendant told her that “he had cut them and that he had been beaten up emotionally by his ex — by his wife and that during the cutting, that the male had taken the knife and fled with the knife.” [17]
Defendant’s statement was played for the jury. In his statement, defendant indicated that he drove to Wilker Neal Street to find his wife and who was with her. Defendant stated that, when Mary Beth and Howard Wilson drove up, he was going to leave but decided to approach them with a knife. Defendant indicated that he intended to “scare her and her friend” “to make ’em talk to me.” Defendant stated that he walked up to the white car, opened the driver’s side door, and told Howard Wilson “we have to talk.” According to defendant, Howard Wilson then “jumped up” and they started to “scuffle.” Defendant stated that he pushed the victim back into the car, and that both he and the victim were armed with knives.
Defendant stated, “my wife, she got stabbed first” then Howard Wilson got stabbed because he pressed the accelerator, which caused defendant to fall onto Wilson. Next, Wilson exited the car and ran one way while defendant ran the other way. Defendant admitted that he threw the knife away as he fled.
On August 16, 1995, Lieutenant Schultz prepared and participated in the execution of a search warrant for defendant’s residence and his vehicle. In defendant’s house, deputies recovered a white t-shirt hidden in the attic that tested positive for blood consistent with Howard Wilson’s DNA.
1 ¡¡Further, at trial, Mary Beth identified defendant, who is now her ex-husband, as the person who stabbed her and Howard Wilson on the night of August 16, 1995. She also testified that neither she nor Howard Wilson had a weapon of any sort during the altercation in question. After hearing the testimony and reviewing the evidence, the twelve-person jury unanimously found defendant guilty as charged of second degree murder.

*376
Law and Argument

On appeal, defendant raises three assignments of error: first, the trial court erred in denying his motion for mistrial; second, the trial court erred in allowing the state to introduce other crimes evidence; and third, the trial court erred in allowing the state to read Mr. Snyder’s personal letters even though they were never offered or intended to be introduced at trial.
In his first assignment of error, defendant argues that the trial court erred in denying his motion for mistrial. Specifically, defendant contends that a mistrial was warranted when the jury was shown his advice of rights form, which indicated that he was charged with first degree murder. Defendant submits that this information was prejudicial.
In response, the State argues that pursuant to La.C.Cr.P. art. 841, defendant failed to inform the trial court of the basis for his objection at the time of occurrence. Thus, the State contends that this issue was not preserved for appeal. Specifically, the State asserts that defendant did not inform the trial court of why the jury “may have been prejudiced.” The State alternatively submits that there is no indication in the record that the jury ever saw the portion of the form that indicated defendant was originally arrested for first degree murder, which tends to indicate that defendant cannot substantiate his claim of prejudice. The State further contends that, even if the jurors did see the subject reference on the form, |inthere was no showing that any of the jurors were influenced or could not render a fair and impartial verdict based on the evidence presented, or that defendant’s presumption of innocence was destroyed.
At trial, during the State’s direct examination of Detective Debbie Labit, the prosecutor introduced the document that defendant signed with Detective Labit, in which defendant waived his Miranda rights. The State offered the document into evidence without objection by defendant and the trial court admitted it. When the State requested publication of the document to the jury, the document was momentarily shown via overhead projector.
The defense team immediately asked for a bench conference and alerted the trial judge and the prosecutors that the document contained that language, “You are under arrest for and will be charged with First Degree Murder.” The defense counsel moved for a mistrial on the basis that the information was “prejudicial.”
After discussion, the trial judge determined that the language was an oversight to all counsel, instructed the State to redact the language from the document, and denied defendant’s motion for mistrial. Specifically, the trial judge noted that the document was visible for such a “brief period of time, that any juror would [not] have ... noticed that or if they did, place any sort of significance on it.... but I don’t think that it would prejudice the jury to an extent that they couldn’t make a fair and impartial decision.”
First, this Court has held that to preserve the right to seek appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for that objection. La.C.Cr.P. art. 841; State v. Smith, 11-638 (La.App. 5 Cir. 3/13/12), 90 So.3d 1114, 1123. An objection made after the evidence is before the jury is too late. Id. The In contemporaneous objection rule is also applied to motions for mistrials. Smith supra.
Here, the defendant moved for a mistrial on the basis that the jury was “prejudiced” by language in a document *377 that was introduced into evidence without objection. The defendant did not offer any further argument regarding how the jury was prejudiced by the language on the document.
A defendant is limited on appeal to those grounds articulated at trial. State v. Jackson, 450 So.2d 621 (La.1984); State v. Styles, 96-897 (La.App. 5 Cir. 3/25/97), 692 So.2d 1222, 1228 n. 2, writ denied, 97-1069 (La.10/13/97), 703 So.2d 609. Here, defendant failed to articulate grounds for his objection at trial so defendant has no grounds to raise on appeal. Thus, under La.C.Cr.P. art. 841, this issue was not preserved for appeal.
Furthermore, even if this error had been preserved for appeal, we would find no abuse of the trial court’s discretion in denying defendant’s motion for mistrial. A mistrial is a drastic remedy and, except in instances in which a mistrial is mandatory, is warranted only when a trial error results in substantial prejudice to defendant, depriving him of a reasonable expectation of a fair trial. State v. Dorsey, 11-745 (La.App. 5 Cir. 4/24/12), 94 So.3d 49, 56, writ denied, 12-998 (La.10/12/12), 99 So.3d 39. Whether a mistrial should be granted is within the sound discretion of the trial court and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. Id.
When the conduct does not fall within the mandatory mistrial provisions of La.C.Cr.P. art. 770,[18] the judge has the sound discretion to determine whether the Inactivity or comment so prejudiced the defendant that he could not receive a fair trial. State v. Talbot, 408 So.2d 861, 866 (La.1980); State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12), 106 So.3d 1232, 1249. The mere possibility that a defendant was prejudiced is insufficient to support an appellate court’s finding of reversible error. State v. Bradham, 638 So.2d 428, 429 (La.App. 5 Cir. 5/31/94).
In this case, the trial judge determined that a brief glimpse of language in a document was not sufficient to establish prejudice in this case. The defendant has not shown in his appellate argument that the trial court abused his discretion when he made that determination. Finally, the mere possibility that a defendant was prejudiced does not constitute reversible error. Bradham, supra. Based on the foregoing, we find no error in the trial judge’s denial of defendant’s motion for mistrial. This assignment of error lacks merit.
In his second assignment of error, defendant argues that the trial court erred in allowing the State to introduce other crimes evidence under La. C.E. art. 404(B)(1). Specifically, defendant contends that the trial court erred in allowing the introduction of previous domestic dis *378 putes between defendant and Ms wife, which he maintains served no purpose other than to depict him as a chronic domestic violence offender. Defendant argues that this error was not harmless because, without this evidence, the jury would likely have convicted him of manslaughter, rather than second degree murder.
The State responds that this issue was previously litigated so this Court could decline further review under the “law of the case” doctrine. The State | lsconcludes that reconsideration should not be afforded because the defense has failed to show palpable error or manifest injustice in this Court’s prior ruling.
Between October 21, 2009 and April 26, 2010, the State filed its original and two amended Notices of Intent to Use Evidence of Other Crimes at defendant’s trial. The Prieur hearing was held on May 4, 2010. At the hearing, the State sought to introduce evidence that defendant had committed other bad acts against his wife in the months leading up to the attack that resulted in the instant homicide. These acts included: simple battery on March 11, 1995, when defendant caused Mary Beth’s head to strike the interior window of his vehicle, causing injury; aggravated battery in May of 1995, when defendant hit Mary Beth in the leg with a baseball bat while she was sleeping; assault in May of 1995, when defendant threatened to “get rid of’ Mary Beth; arrest for simple battery on June 11, 1995, when defendant pushed Mrs. Snyder’s head through the sheetrock of their children’s bedroom; aggravated battery on June 18, 1995, when defendant disabled the electricity to Mary Beth’s parents’ house, illegally entered the house, and stabbed Mary Beth nine (9) times with a screwdriver, which required hospitalization; and, finally, an incident in July of 1995, in which defendant called Mary Beth stating that “he better not catch her out on the street.”
At that hearing, the State argued that the evidence showed that defendant had a history of harassing, threatening, and physically abusing Mary Beth in the months prior to the attack on her and the victim. The State indicated that defendant was extremely jealous, frequently accused Mary Beth of seeing other men, and followed his accusations with physical violence. The State contended that, on the night in question, defendant’s jealousy again caused him to attack and severely injure Mary Beth and kill Howard Wilson.
|14The State contended that the evidence of defendant’s escalating attacks showed defendant’s intent, motive, identity, preparation, and plan. Specifically, the State contended that the prior bad acts against Mary Beth demonstrated defendant’s continuing intent to keep her from either leaving him and/or seeing other men and motive for the fatal attack on Howard Wilson. Further, the evidence reflected preparation and plan as well as defendant’s intent to kill or to inflict great bodily harm on the victim, which is an element of the charged crime. The State maintained that the pri- or bad acts put the attack on the victim in context and, thus, were relevant. Finally, the State argued that the probative value outweighed any prejudicial effect to defendant.
On May 27, 2010, the trial judge granted the State’s Prieur motions, which would allow the State to introduce this evidence at trial. On July 23, 2010, defendant sought supervisory review of the trial court’s ruling with this Court. On August 20, 2010, this Court denied relief, as follows, in pertinent part:
Relevant evidence is evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more proba *379 ble or less probable than it would be without the evidence. La. C.E. art. 401. All relevant evidence is admissible except as otherwise provided by positive law. Evidence which is not relevant is not admissible. La. C.E. art. 402. Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, or waste of time. La. C.E. art. 403.
Evidence of other crimes or bad acts committed by a criminal defendant is generally not admissible at trial. La. C.E. art. 404(B)(Z); State v. Prieur, 277 So.2d 126, 128 (La.1973). However, when such evidence tends to prove a material issue and has independent relevance other than showing that the defendant is of bad character, it may be admitted by certain statutory and jurisprudential exceptions to the exclusionary rule. State v. Aleman, 01-743 (La.App. 5 Cir. 1/15/02), 809 So.2d 1056, 1065.
La. C.E. art. 404(B)(Í) provides:
Except as provided in Article 412, evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for |1sother purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, of the nature of any such evidence it intends to introduce at trial for such purposes, or when it relates to conduct that constitutes an integral part of the act or transaction that is the subject of the present proceeding.
In order for other crimes evidence to be admitted, certain requirements must be met. First, one of the above-enumerated factors must be at issue, have some independent relevance, or be an element of the crime charged in order for the evidence to be admissible. State v. Jackson, 625 So.2d 146, 149 (La.1993). Second, the State must prove that the defendant committed the other acts by a preponderance of the evidence. State v. Hernandez, 98-448 (La.App. 5 Cir. 5/19/99), 735 So.2d 888, 898-899, writ denied, 99-1688 (La.11/12/99), 750 So.2d 194; Huddleston v. U.S., 485 U.S. 681, 685, 108 S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). Third, the requirements for admission of such evidence, set forth in State v. Prieur, 277 So.2d 126, 130 (La.1973), must be met: Within a reasonable time before trial, the State must furnish to the defendant a written statement of the acts or offenses it intends to offer, describing same with the general particularity required of an indictment or information. In the written statement, the State must specify the exception to the general exclusionary rule upon which it relies for the admissibility of the evidence of other acts or offenses. Finally, the probative value of such evidence must be weighed against its prejudicial effect. State v. Lisotta, 97-406 (La.App. 5 Cir. 2/25/98), 712 So.2d 527, 530.
Additionally, the probative value of the extraneous evidence must outweigh its prejudicial effect. State v. Maise, 759 So.2d [884] at 894 [ (La.App. 5 Cir. 2000) ]. The burden is on the defendant to show that he was prejudiced by the trial court’s admission of Prieur evidence. State v. Temple, 01-655 (La.App. 5 Cir. 12/12/01), 806 So.2d 697, 709. Absent an abuse of discretion, a trial *380 court’s ruling on the admissibility of evidence pursuant to La. C.E. art 404(B)(£) will not be disturbed. State v. Williams, 02-645, p. 16 (La.App. 5 Cir. 11/26/02), 833 So.2d 497, 507, writ denied, 02-3182 (La.4/25/03), 842 So.2d 398.
After reviewing the writ application, we find no abuse of the trial court’s discretion in this case. The application reflects that the state had two primary justifications for introducing evidence of bad acts into the record: (1) to prove that Relator had a motive to kill the victim, and (2) to prove that Relator had the specific intent to kill or to inflict great bodily harm upon the victim.
Contrary to Relator’s assertion, the trial court’s reliance on the factually similar case of State v. Colbert, 2007-0947 (La.App. 4 Cir. 7/23/08), 990 So.2d 76 was not misplaced. In Colbert, the state sought to introduce evidence of several bad acts or other crimes the defendant committed before attempting to kidnap his ex-girlfriend and killing his ex-girlfriend’s friend. The state allowed the defendant’s ex-girlfriend to testify about incidents that occurred in the summer of |1(i2003, even though the police were not called to respond to those incidents.
The Fourth Circuit found no error in the trial court’s ruling which allowed the state to introduce the evidence. According to Jennifer Alexander (the defendant’s ex-girlfriend), the defendant threatened to harm her and any man with whom he caught her, as is the case here. Id. at 88. The defendant committed a series of prior bad acts that were “all part of a pattern of the appellant’s obsession with Ms. Alexander.” Id. The Fourth Circuit concluded that “evidence of the prior incidents was relevant to show the appellant’s intent to murder Jefferson as well as his motive for doing so.” Id. The Fourth Circuit also concluded that the probative value of evidence of the prior offenses far outweighed its prejudicial effect. Id.
We similarly conclude that evidence of bad acts or other crimes the defendant committed prior to being charged with second-degree murder are relevant to show intent and motive. We also conclude that the probative value of evidence of the prior bad acts outweighs its prejudicial effect.
State v. Snyder, 10-628 (La.App. 5 Cir. 8/20/10) (unpublished writ disposition), writ denied, 10-2129 (La.11/19/10), 49 So.3d 391.
On appeal, defendant presents essentially the same argument as he made in his writ application. As noted previously, the State urges this Court to refuse reconsideration under the “law of the case” doctrine.
 Under the discretionary principle of “law of the case,” an appellate court may refuse to reconsider its own rulings of law on a subsequent appeal in the same case. State v. Burciaga, 05-357 (La.App. 5 Cir. 2/27/06), 924 So.2d 1125, 1128; State v. Junior, 542 So.2d 23, 27 (La.App. 5 Cir.1989), writ denied, 546 So.2d 1212 (La.1989). The principle is applicable to all decisions of an appellate court; not solely those arising from full appeal. State v. Johnson, 06-859 (La.App. 5 Cir. 4/11/07), 957 So.2d 833, 840. Reconsideration is warranted, however, when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. In re K.R.W., Jr., 03-1371 (La.App. 5 Cir. 5/26/04), 875 So.2d 903, 905; State v. Davis, 03-488 (La.App. 5 Cir. 11/12/03), 861 So.2d 638, 641, writ denied, 03-3401 (La.4/2/04), 869 So.2d 874.
*381 |17In this case, the record reflects that, at trial, witnesses, including Mary Beth and several police officers, testified regarding five violent incidents that were the subject of the Priewr hearing and subsequently reviewed by this Court.[19] Neither our review nor defendant’s brief reveals any new facts adduced at trial that would cast aspersions on this Court’s previous ruling. Further, defendant does not cite to any statutory or jurisprudential authority that reveals that this Court’s prior disposition was patently erroneous and produced an unjust result. Accordingly, in this instance, we will consider our previous ruling on the trial court’s granting of the State’s Prieur motion as the “law of the case” and decline reconsideration. State v. Jones, 08-306 (La.App. 5 Cir. 10/28/08), 998 So.2d 173, 177, writ denied, 08-2895 (La.9/4/09), 17 So.3d 947, cert. denied, 559 U.S. 947, 130 S.Ct. 1519, 176 L.Ed.2d 126 (2010); State v. Lande, 06-24 (La.App. 5 Cir. 6/28/06), 934 So.2d 280, 299, writ denied, 06-1894 (La.4/20/07), 954 So.2d 154; State v. Holliman, 04-1195 (La.App. 5 Cir. 3/29/05), 900 So.2d 999, 1001.
In his final assignment of error, defendant argues that the trial court erred in allowing the State to read defendant’s personal letters even though they were never offered or intended to be introduced at trial. Specifically, defendant claims that he was denied his right to present a defense when his cross-examination of Mary Beth Snyder was “stymied” by the trial court when the trial judge required him to disclose Mary Beth’s letters to him, to the State. Defendant maintains that by ordering him to provide the subject “impeachment” letters to the State, defendant was forced to stop questioning Mary Beth Snyder about her true motives in the |iscase for fear that the trial court would require further revelation of the content of additional letters in his possession.
In response, the State argues that defendant’s argument on appeal is not the argument that defendant raised at trial, which precludes him from asserting this issue. Specifically, the State contends that, at trial, when the letters were discussed, defendant argued that his personal letters were protected from discovery by the State, yet, on appeal, defendant argues that his right to confrontation was violated because he had to stop questioning Mary Beth about her letters to avoid having to disclose those letters to the State. Alternatively, the State argues that defendant failed to proffer the questions it would have asked Mary Beth, and therefore, is unable to show how his cross-examination was “stymied.”
During cross-examination of Mary Beth Snyder, defense counsel asked her if she had communicated with the defendant since 1996, and Mary Beth replied that she had spoken to him over the phone and had written letters to him. Defense counsel questioned Mary Beth about her intent and state of mind when she wrote to defendant then read small excerpts from two documents. The State vociferously objected to defense counsel reading to the jury from a document that had neither been *382 authenticated nor previously disclosed to the prosecution. The trial judge admonished defense counsel not to read from the documents.
Immediately thereafter, the prosecution objected to the use of the purported letters from Mary Beth, based on defense counsel’s failure to disclose the letters to the prosecutor through the State’s request for discovery. The State requested an in camera inspection of the documents by the trial judge to determine if the letters contained evidence that the State may be entitled to discover regarding Mary Beth’s state of mind when she wrote the letters. After reviewing two separate letters that defense counsel had referenced while cross-examining Mary Beth hflSnyder, the trial judge ruled that, although defense counsel may not intend to introduce the letters, the letters contained information regarding Mary Beth Snyder’s state of mind that the State was entitled to know “to conduct a meaningful redirect examination.”
In response to the trial judge’s ruling, defense counsel informed the trial judge during a bench conference, “given the court’s prior ruling regarding the two letters, the 1998 letter and the 1999 letter authored by Mrs. Snyder and sent to Mr. Snyder, I would have had additional questions regarding additional letters written by her but given the court’s ruling, I’m going to stop any questioning along the lines of those letters.” Defense counsel revealed that he was declining further cross-examination on the letters to avoid the risk of the trial judge ordering the defense team to “turn over the letters[,] which are not discoverable in our opinion.”
The trial judge noted, “None of my rulings prevented [defense counsel] from asking your questions as it relates to the letters as of this point in time. I mean, we had the court reporter review the brief series of questions [defense counsel] asked about and you were allowed to do that.” When the prosecutor suggested that defense counsel proffer the questions that he was choosing not to ask Mary Beth because “the appellate court might want to know what ... those questions [are] ... that they’ve been denied the opportunity to ask,” defense counsel “declined.”
First, we note that a defendant is limited on appeal to those grounds articulated at trial. State v. Styles, supra. Here, defendant articulated an evidentiary basis for his objection at trial yet raises different grounds on appeal. A new basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal. State v. Jackson, 04-1388 (La.App. 5 Cir. 5/31/05), 904 So.2d 907, 911, writ denied, 05-1740 (La.2/10/06), 924 So.2d 162. Thus, we find that this issue was not preserved for appeal.
^Furthermore, even if the claim had been properly raised in the trial court, the defendant failed to proffer the substance of the “excluded evidence,” and, thus, failed to preserve the issue for review by this Court. “Error may not be predicated upon a ruling which ... excludes evidence unless a substantial right of the party is affected, and ... the substance of the evidence was made known to the court by counsel.” La. C.E. art. 103(A)(2). “This can be effected by proffer, either in the form of a complete record of the excluded testimony or a statement describing what the party expects to establish by the excluded evidence.” State v. Magee, 11-0574 (La.9/28/12), 103 So.3d 285, 326.
This Court has consistently held that when a defendant does not make known the substance of the excluded evidence for the purpose of consideration by the trial and appellate court, the alleged error is *383 not preserved for review on appeal. See, State v. Massey, 11-358 (La.App. 5 Cir. 3/27/12), 97 So.3d 13, writ denied, 12-0993 (La.9/21/12), 98 So.3d 332 (this Court held that defendant failed to show that the trial judge’s exclusion affected a substantial right where he made no showing of how the excluded testimony was relevant and material to the defense and the record was devoid of any proffer regarding the excluded testimony or the reasons for its admissibility); State v. Thompson, 12-409 (La.App. 5 Cir. 12/11/12), 106 So.3d 1102, 1109-10 (defendant chose not to proffer witness’ testimony and did not make known the substance of the excluded evidence so this Court held defendant failed to preserve the excluded testimony for appeal by failing to object and failing to proffer the evidence). Here, defendant failed to make known the substance of the allegedly excluded evidence and failed to show that the alleged exclusion affected a substantial right. Accordingly, this issue was not preserved for appeal.
121 Error patent review
Finally, as is our customary practice, we have reviewed the record for errors patent, pursuant to La.C.Cr.P. art. 920, and found none requiring corrective action.

Conclusion

In conclusion, we find no merit in defendant’s arguments on appeal. Defendant’s conviction and sentence are hereby affirmed.

AFFIRMED.

. State v. Snyder, 98-1078 (La.4/14/99), 750 So.2d 832, 854.

. State v. Snyder, 95-5114 (La.Dist.Ct. 10/26/00), 2000 WL 35631882.

. State v. Snyder, 98-1078 (La.4/14/04), 874 So.2d 739.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. Snyder v. Louisiana, 545 U.S. 1137, 125 S.Ct. 2956, 162 L.Ed.2d 884 (2005).

. State v. Snyder, 98-1078 (La.9/6/06), 942 So.2d 484, reh’g denied, (La.12/15/06).

. Snyder v. Louisiana, 551 U.S. 1144, 127 S.Ct. 3004, 168 L.Ed.2d 726 (2007).

. State v. Snyder, 98-1078 (La.4/30/08), 982 So.2d 763.

. State v. Prieur, 277 So.2d 126 (La.1973).

. State v. Snyder, 10-628 (La.App. 5 Cir. 8/20/10) (unpublished writ disposition), writ denied, 10-2129 (La.11/19/10), 49 So.3d 391.

. It is undisputed that both parties had engaged in extramarital relationships in 1994 or 1995.

. Daniel Kilian, former patrol officer for the Kenner Police Department, testified that, on June 11, 1995, he responded to a call at the Snyder's home at 508 Hanson Street in Ken-ner. When he arrived, he observed Mary Beth Snyder, who was bleeding from her head and had a scratch on her face. She reported that Allen had pushed her head into a wall in their children’s bedroom. Defendant was arrested in connection with this incident. Further, the parties stipulated that the medical records for East Jefferson General Hospital would establish that Mary Beth Snyder was admitted for medical treatment of injuries to her head on June 11, 1995.

.Sergeant Bonura testified that, on June 18, 1995, he was dispatched to a residence on Wilker Neal in response to an aggravated burglary. Upon arrival, he observed that the victim, Mary Beth Snyder, had sustained a puncture wound to her neck. Sergeant Bon-ura interviewed witnesses and developed Allen Snyder as a suspect. Further, the parties stipulated that the medical records for East Jefferson General Hospital revealed that Mary Beth Snyder was admitted for treatment of numerous deep puncture wounds on June 18, 1995.

. At trial, Allen testified that, when he approached the car, he observed Mary Beth and Howard kissing. He further testified that Howard Wilson "jumped up and that's how the scuffle started." Allen testified that Wilson was armed also. Further, Allen disarmed him then Wilson ran away. Finally, after trying to remove Mary Beth from the car, Allen eventually ran back to his car, and went home.

.That night, Mary Beth Snyder sustained 19 stab wounds, which required surgical intervention and hospitalization.

. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The weapon was never recovered.

. La.C.Cr.P. art. 770 provides the following regarding prejudicial remarks:
Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
(1)Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
(2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
(3) The failure of the defendant to testify in his own defense; or
(4) The refusal of the judge to direct a verdict.
An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

. Those incidents were: (1) simple battery on March 11, 1995, when defendant caused Mary Beth’s head to strike the interior window of his vehicle, causing injury; (2) aggravated battery in May of 1995, when defendant hit Maty Beth in the leg with a baseball bat while she was sleeping; (3) assault in May of 1995, when defendant threatened to "get rid of” Mary Beth; (4) arrest for simple battery on June 11, 1995, when defendant pushed Mrs. Snyder's head through the sheetrock of their children’s bedroom; and (5) aggravated battery on June 18, 1995, when defendant disabled the electricity to Maty Beth’s parents’ house, illegally entered the house, and stabbed Mary Beth nine(9) times with a screwdriver, which required hospitalization.