NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

22-482

STATE OF LOUISIANA

VERSUS

JOSHUA PATRICK RAVED

**********

APPEAL FROM THE
SIXTEENTH JUDICIAL DISTRICT COURT
PARISH OF IBERIA, NO. 18-CR-0672
HONORABLE LEWIS H. PITMAN, DISTRICT JUDGE

**********

CHARLES G. FITZGERALD
JUDGE

**********

Court composed of D. Kent Savoie, Charles G. Fitzgerald, and Gary J. Ortego, Judges.

AFFIRMED.

**Mary Constance Hanes**
**Louisiana Appellate Project**
**Post Office Box 4015**
**New Orleans, Louisiana 70178-4015**
**(504) 866-6652**
**Counsel for Appellant:**
    **Joshua Patrick Raved**


**M. Bofill Duhé**
**District Attorney**
**Sixteenth Judicial District**
**Cynthia Spadoni**
**W. Claire Howington**
**300 Iberia Street, Suite 200**
**New Iberia, Louisiana 70560**
**(337) 369-4420**
**Counsel for Appellee:**
    **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Joshua Patrick Raved, appeals his convictions and sentences for second degree murder and possession of a firearm by a person convicted of domestic abuse battery.

## PROCEDURAL HISTORY

In June 2018, Defendant was charged by bill of indictment with second degree murder in violation of La.R.S. 14:30.1, and possession of a firearm by a convicted felon in violation of La.R.S. 14:95.1. The second count was subsequently amended to possession of a firearm or carrying a concealed weapon by a person convicted of domestic abuse battery in violation of La.R.S. 14:95.10.

A four-day jury trial commenced in September 2021. At the conclusion of trial, the jury unanimously convicted Defendant of the charged offenses. Two months later, the trial court sentenced Defendant as follows: (a) for second degree murder, Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence; and (b) for possession of a firearm by a person convicted of domestic abuse battery, Defendant was sentenced to five years at hard labor with a fine of $500.00, and this sentence was ordered to run consecutively with the sentence imposed for second degree murder. Defendant appealed.

On appeal, defense counsel asserts two assignments of error:

1. [Defendant] was denied his constitutional right to present a defense by the trial court's refusal to allow him to introduce text messages from the deceased victim's phone which revealed that the State's key witness against him had recently attacked the victim and thus might be the perpetrator in the current matter.

2. The trial court abused its discretion in denying the defense's motion for mistrial after the State's witness, Keenly Jones, testified that his son (the victim) told him that [Defendant] was

the person who shot him; the testimony constituted inadmissible hearsay.

In addition, Defendant asserts the following pro se assignment of error:

1. [The] Trial Judge abused his discretion when he ruled that the State's Motion to Admit Defendant's Statements, filed the day before trial, was timely, and then admitted the statements [into evidence], violating [Defendant's] right to be free from self-incrimination confrontation, and a fair trial under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and [La.Const.] Article I, § 16.

## LAW AND ANALYSIS

### I. Errors Patent

In accordance with La.Code Crim.P. art. 920, all criminal appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

### II. Evidence Adduced at Trial

Corey Ronsonet, the State's witness, testified that he was with Defendant on the night of February 19, 2018, through the early morning hours of February 20, 2018. He claimed that they had been at his shop working on a transmission from 8:00 p.m. until about 2:00 a.m., at which time they left and went to Ian Jones's apartment. Corey testified that he was living at his aunt's house and did not want to wake her up, so they went to Ian's apartment to sleep. Corey claimed that although he had never slept at Ian's apartment before that night, he and Ian were friends.

Corey testified that when he knocked on the door upon arriving at Ian's apartment, no one answered. He then entered the garage to look for a piece of metal to assist him with getting inside the apartment. He explained that he and Ian had previously used this piece of metal to enter the apartment. But instead of finding the piece of metal, he testified that he found a .22 caliber gun situated behind the

cushions of a recliner. Corey testified that he showed it to Defendant and said, "I heard Ian had taken a gun from somebody. I don't want no part of it." Corey testified that Defendant kept the gun.

Corey then explained that he "went upstairs through the back window, to the kitchen window and climbed through the window to get in and Ian was sleeping on the couch." Corey next opened the door for Defendant to enter the apartment. Thereafter, Corey laid down on a living-room couch adjacent to where Ian was sleeping. Corey testified that while he was trying to sleep, he heard Defendant walk towards Ian and say something, and then Defendant hit Ian's face. Corey claimed that Ian jumped up hollering. Corey then asked Defendant why he hit Ian, to which Defendant responded that Ian had killed his (Defendant's) "baby's momma" with heroin.

Corey testified that he then walked to the garage to get away from the situation, but Defendant and Ian followed him. Corey explained that Defendant, who was holding the gun, told Ian to move to the dark area of the garage. At this point, Corey claimed that he reentered the apartment and was walking up the stairs when he heard a shot. Corey testified that he went back outside which is when he witnessed Defendant shoot Ian in the back of the head. Shortly thereafter, police sirens could be heard. Defendant said he needed to leave. But before running away, Defendant fired more shots into Ian.

Corey explained that he then went back upstairs to look for a phone. He ended up sitting down on a couch, believing that he was experiencing a bad dream. Corey explained that while he was on the couch, Ian's roommate, Jacob Bourque, entered the living room and said something had happened to Ian. Corey testified that he and

3

Jacob ran downstairs, and he placed a cushion beneath Ian's head, tried to stop the bleeding, and performed CPR.

Jacob Bourque testified that on the night in question, Defendant went to their apartment where Ian was asleep on the couch. According to Jacob, he and Defendant ate dinner together. Jacob explained that after dinner, Defendant left and Jacob went to sleep in his room. Jacob woke up and described what he heard as follows:

> Well, I just kind of laid there and then I heard Ian say - - no, at first he said, "Ow," I guess he got hit by something because they had blood like on the floor right there. Then he said, "Josh, why you got a gun." Josh said, "You want to kill my baby's momma." He said, "Get up." And he made him go down the stairs and I froze right there after he said that. I didn't move. So Ian went down the stairs and he said, "Man, what you doing, bruh? It wasn't me," or something, and then he shot him, pop, pop, pop. Like five times - - four or five times.

Jacob testified that after hearing the shots, he heard someone running back up the stairs. Jacob claimed that after five minutes, he walked into the living room where he saw Corey lying on the love seat and blood on the floor. According to Jacob, he asked Corey what was going on, and Corey responded, "What you mean?" Jacob claimed that he ran downstairs where he saw Ian and then ran back upstairs and told Corey to call 911. Police responded soon thereafter. Jacob testified that he was one hundred percent sure that the conversation he overheard was between Defendant and Ian.

Keenly Jones, who was Ian's father, testified that Ian was in a coma following the shooting. Mr. Jones revealed that after Ian awoke from his coma and was communicative, Ian told him that Defendant was the shooter. Mr. Jones testified that this conversation occurred between March 1-3, 2018. Mr. Jones explained that he notified a detective of his son's statement, and he was given assurances that the detective would speak with Ian. But according to Mr. Jones, this never happened.

Mr. Jones noted that Ian was subsequently transported to a rehab center in New Orleans on March 15, 2018. Ian subsequently passed away.

Jeanerette Chief of Police Dusty Vallot also testified at trial. He interviewed Corey and Jacob. Chief Vallot testified that Corey said he saw Defendant shoot Ian; Jacob did not see it, but heard it, and said he knew it was Defendant's voice. After obtaining these witness statements, Chief Vallot issued a warrant for Defendant's arrest.

Sergeant Corey Derouen, a corrections officer with the Iberia Parish Sheriff's Office, testified that on February 22, 2018, he was asked to bring Defendant to the restroom. On the way there, some of the inmates called out to Defendant and asked him what he was "in for." Defendant replied, "They got me in here for attempted murder because I shot that nigga Ian in the head."

Deputy Mary Davis testified that she was present in the jail chapel for first appearances on February 22, 2018, and she asked Defendant how he was doing. He responded, "I'm not doing good. . . . I shot -- I wish he would've died. I'm going to shoot that bitch again."

Defendant testified at trial that he did not know either Corey or Jacob, but he knew Ian as being an "associate" of his child's deceased mother. On February 6, 2018, he learned of his child's mother's death. Defendant testified that on the night of the incident, he was told by a friend that he needed to clear his name because he was being accused of shooting the victim. That is why he arrived at the crime scene when police were present. As for the statement he made in the presence of Sergeant Derouen, Defendant explained that he actually said, "Obviously, they trying to say I shot Ian Jones." When asked about the statement he made in the chapel, Defendant explained:

I never said anything directly - - through that whole entire video I never once mentioned Ian's name. Ms. Mary asked me what I was going through and how I was doing, and I told her clearly, "If I [had] the opportunity I would shoot him again," through [sic] the fact of the matter this is an emotional feeling. My bond is about to get set for something I didn't - - I don't have the finances at the time to bond out of jail for a crime that I never committed.

Defendant confirmed that he was upset that Ian was accused of giving his child's mother bad drugs.

### III.   First Assignment of Error

In his first assignment of error, Defendant contends he was denied his constitutional right to present a defense by the trial court's refusal to allow him to introduce six text messages from the deceased victim's phone. The text messages, according to Defendant, show that Corey Ronsonet had previously attacked the victim with a machete, meaning that Corey might be the perpetrator in the current matter. The text messages were proffered by defense counsel.

The proffered text messages were between the victim, Ian, and a person named Jamie. The first text message was sent by Jamie on February 14, 2018, and it reads: "Cory said u was fixing to rob him." Jamie resent this message to Ian the following day. And then on February 17, 2018, the following text exchange occurred:

[Jamie:]      Nigga wtf did Cory do
[Jamie:]      He hit u with a machete???
[Ian:]        No he swung it
[Jamie:]      Omg. . . down Iberia st at 6am??

Because this assignment challenges the trial court's ruling on an evidentiary issue, the applicable standard of appellate review is abuse of discretion. *Stewart v. Ice*, 07-871 (La.App. 4 Cir. 4/9/08), 982 So.2d 928, *writ denied*, 08-1000 (La. 8/29/08), 989 So.2d 101.

6

For an out-of-court written statement to be admitted in evidence to prove the truth of its contents, the statement must be relevant, non-hearsay (or an exception to the hearsay rule), authenticated, and satisfy the original writing rule. The concern here is relevancy and hearsay.

Turning first to relevancy. While the proffered text messages were between Jamie and Ian, the texts refer to someone named "Cory." At trial, Corey Ronsonet was the eyewitness who testified for the State. Thus, the text messages are only relevant if the "Cory" referred to therein is Corey Ronsonet. And without the testimony of Jamie, the relevancy of these messages cannot be established.

Now to hearsay. In excluding the text messages, the trial court correctly found that no statutory exception to the hearsay rule applied. However, under the constitutional guarantees affording a criminal defendant the right to present a defense, there is a jurisprudentially developed "compelling-circumstances exception."

The compelling-circumstances exception was addressed by the Louisiana Supreme Court in *State v. Gremillion*, 542 So.2d 1074 (La.1989). There, the supreme court concluded that normally inadmissible hearsay may be admitted if it is reliable, trustworthy, and relevant, and if to exclude it would compromise the defendant's right to present a defense. In this sense, reliable and trustworthy connote assurances that the hearsay statements are credible. But here, without Jamie's testimony, the foundation that the text messages are reliable or trustworthy cannot be established.

Finally, as explained in *State v. Jackson*, 12-0090 (La.App. 4 Cir. 4/24/13), 115 So.3d 1155, *writ denied*, 13-1235 (La. 12/2/13), 126 So.3d 497, *cert. denied*, 572 U.S. 1088, 134 S.Ct. 1950 (2014), a defendant may not rely on the constitutional

7

right to present a defense to avoid calling witnesses whose statements he wants admitted in support of his defense. Likewise, the record before us does not show that defense counsel made any effort to subpoena or otherwise compel Jamie to testify at trial. Thus, Defendant may not now rely on his constitutional right to present a defense to excuse this oversight.

For the above reasons, the trial court did not abuse its discretion in excluding the proffered text messages. Defendant's first assignment is without merit.

**IV.    Second Assignment of Error**

In his second assignment of error, Defendant contends that the trial court erred in denying his motion for mistrial after Keenly Jones testified that his son, the victim, told him that Defendant was the person who shot him. Defendant claims that this testimony constitutes inadmissible hearsay warranting a mistrial.

Keenly Jones was called as the State's witness. During his testimony, he was asked what happened to his son on February 20, 2018. Mr. Jones responded as follows: "Well, when Ian woke up he told me that -- I asked him what happened, that he was shot by Joshua Raved." There was no objection by the defense. Mr. Jones was next asked about how he first heard about his son being shot and about his son's medical treatment following the shooting.

At some point thereafter, the State asked Mr. Jones the following question: "Did [your son] tell you--you said he told you who did it?" In response, Mr. Jones answered yes, to which defense counsel objected. But the basis for the objection was that the statement was not produced during discovery. The State, in turn, argued that because the statement was not written or recorded, production was not required under La.Code Crim.P. art. 716. Defense counsel then moved for a mistrial. The motion was denied. Defense counsel then asked for at least one hour to review

medical records prior to beginning his cross examination of Mr. Jones. To appease this request, the trial court allowed the State to complete its direct examination and then recessed for the day, thereby giving defense counsel much more time to review the medical records.

The next morning, prior to any witness testimony, defense counsel again moved for mistrial on the grounds previously asserted, but this time adding that Mr. Jones's testimony identifying Defendant as the shooter was inadmissible hearsay. This motion was also denied by the trial court.

On appeal, Defendant asserts that the trial court abused its discretion in denying the motion for mistrial, specifically homing in on the hearsay nature of Mr. Jones's testimony. This assignment lacks merit for two reasons. First, the hearsay basis for mistrial has been waived. The State correctly points out that a contemporaneous objection was not made at the time that the hearsay statement was initially made—or at any time thereafter during the State's direct examination, including when Mr. Jones was asked to elaborate about who shot his son. *See* La.Code Crim.P. art. 841(A). As noted by the fifth circuit in *State v. Snyder*, 12-896, p. 10 (La.App. 5 Cir. 10/9/13), 128 So.3d 370, 376, *writ denied*, 13-2647 (La. 4/25/14), 138 So.3d 643, "An objection made after the evidence is before the jury is too late." This assignment of error has therefore been waived.

And second, even if a contemporaneous objection had been made, any error by the trial court would have been harmless. As explained in *State v. Magee*, 13-1417, p. 7 (La.App. 1 Cir. 3/24/14), 143 So.3d 532, 537, "when hearsay testimony . . . is improperly introduced into evidence, it will be considered harmless error if it is found to be cumulative and corroborative of other properly admitted evidence."

Here, any error by the trial court in admitting Mr. Jones's hearsay statement would have been harmless error. After all, the statement was cumulative and corroborative of other properly admitted evidence such as Corey Ronsonet's eyewitness testimony of the shooting, Jacob Bourque's testimony that he heard Ian and Defendant arguing immediately before the shooting, and Defendant's inculpatory statements made following his arrest.

## V.    Pro Se Assignment of Error

In his pro se brief, Defendant asserts that the "Trial Judge abused his discretion when he ruled that the State's Motion to Admit Defendant's Statements, filed the day before trial, was timely, and then admitted the statements [into evidence], violating [Defendant's] right to be free from self-incrimination confrontation, and a fair trial[.]"

On September 22, 2021, the State filed a notice of intent to introduce inculpatory statements, including Defendant's statement to Sergeant Derouen. That same day, the State filed a motion to determine the admissibility of Defendant's inculpatory statements. The motion was filed pursuant to La.Code Crim.P. art. 767, which provides that "[t]he state shall not, in the opening statement, advert in any way to a confession or inculpatory statement made by the defendant unless the statement has been previously ruled admissible in the case." The hearing on this motion was set for September 27, 2021, which was one day before trial.

At the September 27 hearing, defense counsel argued that the State's motion was untimely: the motion had not been filed within thirty days of discovery as required by La.Code Crim.P. art. 521. Defense counsel then requested that the trial court preclude the State from mentioning any of Defendant's inculpatory statements during its opening statement at trial. In response, the State contended that there was

no requirement as to when the hearing had to be held, that Defendant had been granted pretrial discovery, and that defense counsel had been in possession of the inculpatory statements for "a very long time." Ultimately, the trial court found that the State's motion was timely filed, and that the inculpatory statements would be admissible at trial.

As to Defendant's pro se assignment of error, there is no question that the trial court erred in finding that the State's pretrial motion was timely filed. Indeed, paragraph (A) of La.Code Crim.P. art. 521 provides that "[p]retrial motions shall be made or filed within thirty days after receipt of initial discovery, unless a different time is provided by law or fixed by the court upon a showing of good cause why thirty days is inadequate." And while the trial court also erred in allowing the State to reference Defendant's inculpatory statements during its opening statement, the trial court did not abuse its discretion in admitting the inculpatory statements into evidence at trial.

The admissibility of the inculpatory statements is addressed by La.Code Crim.P. art. 768, which states:

> Unless the defendant has been granted pretrial discovery, if the state intends to introduce a confession or inculpatory statement in evidence, it shall so advise the defendant in writing prior to beginning the state's opening statement. If it fails to do so a confession or inculpatory statement shall not be admissible in evidence.

Defendant here was granted pretrial discovery; the inculpatory statements were provided to defense counsel during discovery; and notice of the State's intent to introduce the inculpatory statements in evidence was timely given. Thus, the State complied with La.Code Crim.P. art. 768 as to the admissibility of the inculpatory statements.

11

To summarize, the trial court erred in finding that the State's pretrial motion was timely filed, and the trial court also erred in allowing the State to reference Defendant's inculpatory statements during its opening statement.  However, these errors were harmless considering that the inculpatory statements were admitted in evidence at trial without objection.[1]

Accordingly, this assignment of error is also without merit.

**DECREE**

For the above reasons, Defendant's convictions and sentences are affirmed.

**AFFIRMED.**

THIS OPINION IS NOT DESIGNATED FOR PUBLICATION.
Uniform Rules, Courts of Appeal, Rule 2-16.3

---

[1] At the hearing on September 27, 2021, defense counsel did not object to the admissibility of the inculpatory statements; the objection was that the State should not be allowed to reference the statements during its opening statement.  And at trial, no objection was made as to the admissibility of these statements.