850 So.2d 845 (2003)
STATE of Louisiana
v.
Michael P. ENCLARD.
No. 03-KA-283.
Court of Appeal of Louisiana, Fifth Circuit.
June 19, 2003.
*848 Holli Herrle-Castillo, Louisiana Appellate Project, Marrero, LA, for Appellant, Michael P. Enclard.
Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District Court, Parish of Jefferson, Terry M. Boudreaux, Margaret E. Hay, Appellate Counsel, John Maestri Gordon R. Konrad, Trial Counsel, Assistant District Attorneys, Gretna, LA, for Appellee, State of Louisiana.
Panel composed of Judges THOMAS F. DALEY, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
SUSAN M. CHEHARDY, Judge.
On May 17, 2001, the Jefferson Parish District Attorney's Office filed a bill of information charging the defendant, Michael Enclard, with aggravated burglary, in violation of La. R.S. 14:60, and forcible rape, in violation of La. R.S. 14:42.1. The defendant was arraigned and pled not guilty.[1]
On November 27, 2001, trial commenced. The following day, the twelve-person jury found the defendant guilty as charged of forcible rape and guilty of unauthorized entry of an inhabited dwelling, a responsive verdict to aggravated burglary.[2]
Defendant filed motions for a new trial and for post-verdict judgment of acquittal, which the trial judge denied. On December 10, 2001, the trial judge sentenced the defendant to three years imprisonment at hard labor for unauthorized entry of an inhabited dwelling. On the forcible rape conviction, the judge sentenced defendant to fifteen years imprisonment at hard labor with the first two years without benefit of parole, probation or suspension of sentence. The trial judge also specified that defendant's crime of forcible rape was a violent crime under La.C.Cr.P. art. 890.1, and, thus, defendant was not entitled to diminution of sentence for that conviction. The defendant filed a motion for appeal, which the trial judge granted.[3]
Facts
By all accounts, A.Z.[4] and the defendant had a stormy relationship that lasted approximately *849 three years and produced two children, both of whom were less than three years old on March 11, 2001. The victim and defendant lived together for most of their relationship. According to the victim, the defendant frequently physically abused her by hitting, kicking, and punching her throughout their relationship, even while she was pregnant.
On November 27, 2000, the victim called the police to report that the defendant had hit her in the head. As a result, the defendant was arrested and the victim obtained a protective order dating from November 28, 2000 until May 28, 2001. Nevertheless, the victim continued living in the same house as the defendant until mid-December 2000.[5]
In mid-December 2000, defendant again hit the victim. As a result, the victim developed a black eye. Thereafter, the victim moved out of the apartment that the two shared. Defendant admitted at trial that his elbow "accidentally" hit the victim's right eye while they were wrestling during an argument.
In December of 2000, A.Z. and the children moved in with a friend. After A.Z. moved out, the defendant repeatedly called and harassed her at work and at her friend's apartment. In February of 2001, A.Z. obtained her own apartment on York Street in Metairie. She testified that she did not tell the defendant her address or telephone number but, according to defendant, he discovered that information on the Internet.
On the night of March 11, 2001, A.Z. arrived home at about 7:00 p.m. with her two children. About forty-five minutes later, her son spilled something on the floor in the den. While she was on her hands and knees cleaning up the mess, the defendant came out of the closet behind her, held a sharp object to her throat, and told her not to scream or he would kill her. She later saw that the object was a screwdriver and that defendant had cut her on the neck with the screwdriver. Defendant told her that he wanted to kill her and that she drove him to "this" because she did not want to be with him anymore.
Defendant then directed her to put the children to bed. During this time, he followed her around the apartment with the screwdriver. Although she wanted to call the police, the only corded phone was unplugged and defendant had both of her cordless phones in his pants' pocket.
After awhile, defendant asked A.Z. to remove her clothing but she refused. When defendant threatened to kill her, she removed her clothing from waist down. Defendant removed his pants, forced her to lie down on the floor and then vaginally raped the victim.
Afterwards, defendant made her turn onto her side with her back toward him and she felt defendant "doing something" with her hands behind her back. A.Z. begged him to let her go. Defendant remarked that he might leave if she let him tie her up, closed her eyes, and went to sleep. Abruptly, he stopped "doing something" with her hands and told her to sit on the couch. Defendant then removed all of his clothing and raped A.Z. on the couch.
*850 Afterwards, A.Z. asked defendant if she could put her clothes on and defendant agreed. Once she was clothed, A.Z. immediately ran out of the apartment to ask her upstairs neighbor to call the police. According to the 911 phone logs, the 911 call from the neighbor's phone number was received at 1:39 a.m. on March 12, 2001.
Deputy Rose Eddy of the Jefferson Parish Sheriff's Office was one of several officers who responded to the scene. Shortly after 1:40 a.m., Deputy Eddy found A.Z. crying outside of her apartment. According to Deputy Eddy, A.Z. related that her ex-boyfriend had pried open the rear sliding door of her apartment, hidden in the living room closet, attacked her, and held her against her will for approximately six hours. A.Z. showed Deputy Eddy the direction defendant had fled and Deputy Eddy broadcast a description of the defendant on the police radio. Although they searched for him, the officers did not immediately find defendant.
At this point, A.Z. realized that the defendant had stolen her car keys after assaulting her. According to A.Z., the police told her to persuade the defendant to return to her apartment by telling him that she would not press charges against him.
A little later that morning, Sylvia McGarry, the victim's best friend, arrived at A.Z.'s apartment. After all of the officers left, the defendant telephoned, and A.Z. convinced defendant to return to the apartment. A.Z. called 911 again to report that the defendant was on his way to her apartment.
At approximately 7:05 a.m., Deputy Steve Caravella responded. When Deputy Caravella interviewed A.Z., she related that the defendant had raped her and he was on his way back to her apartment. Deputy Caravella left to canvass the area for the defendant. While he was searching for the defendant, Deputy Caravella received another call from dispatch that the defendant was knocking on A.Z.'s apartment door. Deputy Caravella returned and placed the defendant under arrest without incident. Deputy Caravella testified that, when he patted the defendant down, he found a "large bootlace" in the defendant's pocket, but he did not find a screwdriver on defendant's person.
After the defendant was arrested, Ms. McGarry took A.Z. to the hospital. Deborah Guzzardo LeBlanc was the triage nurse in the emergency room. Nurse LeBlanc testified that she telephoned the police to ensure that a report for rape had been made, and the police told Nurse LeBlanc that an officer would be sent to the hospital.
Nurse LeBlanc testified that A.Z. was "tearful" and complained of abdominal pain. Additionally, Nurse LeBlanc testified that A.Z. had a "superficial laceration" on her neck that did not require stitches. A photograph of the laceration was taken and introduced into evidence at trial.
Deputy Caravella, who had responded to the victim's 911 call and eventually arrested the defendant, went to the hospital to speak with the victim. When he realized that the rape allegation was not included in the initial report written by Deputy Eddy, he reported the rape allegation in a supplemental report.
Detective Jolyn Cummings of the Jefferson Parish Sheriff's Office Personal Violence Unit was alerted to the allegation and reported to the hospital. Detective Cummings testified that A.Z. cried when they began talking at the hospital. The doctor performed a rape kit examination and told Detective Cummings that seminal fluid was present. Detective Cummings acknowledged that the laboratory report indicated no seminal fluid was detected on the vaginal swabs, but was found on the *851 victim's underwear. The State and defense stipulated that the semen belonged to the defendant.
The State also presented testimony from Joe Wool, an investigator for the Jefferson Parish District Attorney's Office. Mr. Wool testified that when he was reviewing the file in preparation for trial, he noticed that the original crime scene photographs did not show any "direct pictures of the locking mechanism" on the sliding door.
The day before trial, Mr. Wool went to the apartment on York where the incidents occurred and asked the current residents (not the victim) if he could look at the door. Mr. Wool testified that he observed "visible pry" marks near the "locking mechanism" on the door. The shift sergeant for the Jefferson Parish Sheriff's Office met him at the apartment with a Polaroid camera. Mr. Wool took possession of the Polaroids after the sergeant photographed the door.
Defendant's version of the events differed substantially from the victim's. Defendant stated that, on March 10, 2001, he and A.Z. had arranged to go out to eat the next day. According to defendant, A.Z. picked him up on the evening of March 11, 2001, at the North Kenner Library, which was near the defendant's residence. They decided against going out to eat, however, because she did not have any money so she suggested that they go to her apartment instead.
Defendant said that night he and A.Z. watched NASCAR with their son then put the children to bed around 10:30 p.m. According to defendant, he and A.Z. then had consensual sexual intercourse. Afterwards, A.Z. gave him her car keys to go to the store for cigarettes. Defendant did not go to the store, however, because, he claims, they started talking about the past, which led to an argument. According to defendant, however, they reconciled and, subsequently, had consensual sexual intercourse again.
Shortly thereafter, at defendant's insistence, A.Z. went to check on their infant who was crying. According to defendant, A.Z. was in the child's room for approximately five minutes, when "all of a sudden, she came out the room, headed straight for the front door, phone in her hand. I hear her press three numbers. I hear her say `I need an officer out to 4817 York Street,' and she was out the door.'" At that point, defendant dressed and left the apartment.
After leaving, defendant called his sister, Melissa Guillie, from a pay telephone. Ms. Guillie testified that she picked up the defendant between 1:00 and 2:00 a.m. at Webster's Restaurant on Clearview Boulevard and they drove around in her car for a while. Ms. Guillie telephoned the victim after she picked up her brother and A.Z. did not really seem upset on the telephone. Ms. Guillie then dropped the defendant off at the Department of Motor Vehicles in Kenner and went home.
Defendant testified that, at approximately 7:30 a.m., he returned to A.Z.'s apartment to return her keys. While there, he was arrested. Defendant assumed that he was being arrested for violating the restraining order.
Patricia and Pete Whittington, the defendant's mother and step-father, also testified for the defense. Mrs. Whittington testified that the defendant lived with her from November 27, 2000 through March 12, 2001. Mrs. Whittington further stated that A.Z. had a black eye on Christmas day of 2000. According to Mrs. Whittington, the defendant explained the black eye had occurred when his elbow had hit A.Z.'s eye while the two of them were wrestling and playing. Mrs. Whittington acknowledged *852 that A.Z. remained silent after defendant's explanation.
Mrs. Whittington testified she did not believe the defendant was capable of harming A.Z. and denied she would lie for the defendant. Mr. Whittington stated that A.Z. often brought the children to the Whittington residence for the defendant to babysit.
The defense also called Patricia Pradat, the mother of a friend of the defendant, as a witness. Ms. Pradat testified that she saw the defendant and A.Z. at the Kenner City Hall in January of 2001 and that A.Z. appeared to be there of her own free will. Finally, the defense called A.Z.'s upstairs neighbor, Debbie Hillebrandt, as a witness. Ms. Hillebrandt testified that her fiancé answered the door at 1:30 a.m. on March 12, 2001 and that he called the police. Ms. Hillebrandt testified that she observed the defendant leaving the apartment complex.
In assignment of error number one, defendant argues that the trial court erred in admitting crime scene photographs taken the day before trial. The defendant points out that the Polaroid photographs of the rear door of the victim's apartment were not disclosed to the defense until the morning of trial. Further, because the Polaroids depict "pry marks" on the doorframe that were not depicted in the original crime scene photographs, defendant contends that their introduction into evidence was not harmless error.[6]
The rules of discovery are intended to eliminate unwarranted prejudice arising from surprise testimony, to permit the defense to meet the State's case, and to allow proper assessment of the strength of its evidence in preparing a defense. State v. Statum, 390 So.2d 886, 889-90 (La.1980), cert. denied, 450 U.S. 969, 101 S.Ct. 1489, 67 L.Ed.2d 619 (1981). The failure of the State to comply with discovery rules does not bring automatic reversal; rather, prejudice must be shown. State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272, 1281, cert. denied, 517 U.S. 1246, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1995).
First, we note that, on August 20, 2001, the defense made a motion to view the crime scene, which the trial judge denied. At the August hearing on defendant's motion to view the scene, the defendant argued that he needed to view the scene in order to prepare a defense and the prosecutor informed the court that the crime scene no longer existed. He specifically stated:
Judge, it's no longer even a crime scene. Everything has been repaired. The door that was damaged and broken into is now fixed. We have pictures that we've given to Defense Counsel. [Defense counsel] can look at those.
I don't think there's going to be anything that she can gain by going in there and snooping around somebody's apartment.
* * *
There's no scene, Judge. The crime scene processed it and took pictures.
When the defense attorney stated at that hearing that no photographs had been provided to her, the prosecutor invited the defense to view the crime scene photographs at any time. When asked by the court whether the crime scene "photographs show the point of entry and so on," the prosecutor replied affirmatively. *853 Thereafter, the trial judge denied the defendant's motion to view the crime scene.[7]
Three months later, on the first day of the trial, the prosecutor informed the court that the State obtained Polaroid photographs of the crime scene the previous night and had shown these to the defense on the morning of trial. Defense counsel objected to the Polaroids "[b]ased on the fact that we were not allowed to see the crime scene and the Defendantor the District Attorney was allowed to go and view the crime scene and photograph additional pictures, which they just presented to us."
The prosecutor, who had previously informed the defense that the crime scene no longer existed, responded that the State had obtained the photographs by merely asking the current occupant of the apartment (who was not the victim) for permission to take photographs. The trial judge noted defendant's objection.
On appeal, defendant's primary argument is that his defense to aggravated burglary was prejudiced by the admission of the Polaroids because they depict pry marks on the door that are not depicted in the original crime scene photographs. However, when the State informed the court and defense before trial that it would seek to introduce newly obtained photographs, defense counsel's objection was that they had not been allowed to view the scene. Defendant did not object to the photographs on the basis that their content was prejudicial.[8]
To preserve the right to appellate review of an alleged trial court error, a party must state an objection contemporaneously with the occurrence of the alleged error, as well as the grounds for the objection. See La.C.Cr.P. art. 841(A); State v. Gaal, 01-376, p. 17 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 949. The purpose behind the contemporaneous objection rule is to put the trial judge on notice of an alleged irregularity so that the problem may be cured by the judge, as well as to prevent the defendant from gambling on a favorable verdict and then resorting to appeal on errors that might easily have been corrected by an objection. State v. Ware, 01-194, p. 14 (La.App. 5 Cir. 8/28/01), 795 So.2d 495, 504.
Both this Court and the Louisiana Supreme Court have held that a new basis for an objection may not be raised for the first time on appeal. State v. Cooks, 97-999 (La.9/9/98), 720 So.2d 637, 644, cert. denied, 526 U.S. 1042, 119 S.Ct. 1342, 143 L.Ed.2d 505 (1999); State v. Burdgess, 434 So.2d 1062, 1067 (La.1983); State v. Myers, 584 So.2d 242, 255 (La.App. 5 Cir. 1991), writ denied, 588 So.2d 105 (La. 1991), cert. denied, 504 U.S. 912, 112 S.Ct. 1945, 118 L.Ed.2d 550 (1992). Both Cooks and Myers, supra, held that the defendant's arguments were not preserved for review because the arguments were not raised in the trial court.
In State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97), 703 So.2d 63, 77, writ denied, 98-264 (La.6/19/98), 719 So.2d 481, this Court addressed defendant's assigned error only on the basis of the objection raised at trial, not the new basis urged for the first time on appeal. Accord, State v. *854 Gaal, 01-376 (La.App. 5 Cir. 10/17/01), 800 So.2d 938, 950. We will therefore address defendant's assigned error on the basis of the objection raised at trial, which was that he had not been allowed to view the scene.
In this case, during the pre-trial hearing on defendant's motion to view the scene, the prosecutor specifically told the defendant and the trial judge two things during the hearing: first, that the available crime scene photographs accurately depicted the point of entry and, second, that the crime scene no longer existed because the damage had been repaired. In this instance, the State's responses at the August motion hearing may have lulled defendant into a misapprehension of the strength of the State's case.[9]
In his brief on appeal, defendant contends that he was prejudiced by the introduction of the Polaroid photographs because he was "unprepared to defend against physical proof that tended to corroborate one of the allegations [since] the defendant ... [was] denied the right to... investigate the crime scene and get the pictures for himself." Apparently, defendant's reference to "allegations" is to the charged crime of aggravated burglary.[10]
Here, the State responds that, even if the photographs were not properly admitted, their admission was harmless because the defendant cannot establish that he was prejudiced by their introduction. The State points out that the photographs were cumulative of Deputy Eddy's testimony regarding the condition of the doorframe on the night of the incident.
We decline to comment on the apparent lack of truthfulness on the part of the prosecutor at the August hearing on defendant's motion to view the scene. We do, however, mention that, in our opinion, the prosecutor knew or should have known that, before the State sought this new evidence on the eve of trial, that the defense should have been alerted to the State's intention and, further, that the defense should have been offered the opportunity to be present to view the new evidence.
Ultimately, although we agree that the introduction of the Polaroid photographs was erroneous, we find that the defendant has failed to demonstrate that his defense was prejudiced by this error. First, the State presented other evidence which tended to prove unauthorized entry into the victim's apartment. The victim herself testified that the defendant, who was not supposed to be in her house, was hiding in a closet in her living room when she arrived home.
Moreover, defendant was allowed to thoroughly cross-examine Deputy Eddy regarding her memory of the crime scene on the night of the attack. Furthermore, in her cross-examination of Investigator *855 Joe Wool, defense counsel elicited that the photographs were taken the day before trial and that Wool could not testify when the damage depicted in the photographs was caused.
With regard to the defendant's invitee defense, we find that even without the Polaroid photographs, a reasonable jury could have concluded that this defense was without merit. The victim testified that the defendant harassed her for months before this incident. Further, she had a restraining order that was in effect at the time of the incident. Moreover, she testified that she did not tell defendant her address or phone number and that he claimed that he found it through a search on the Internet.
The victim's testimony is corroborated by Sylvia McGarry's testimony that the defendant was harassing the victim at work. Further, Ms. McGarry was staying overnight at the victim's apartment for several weeks before this incident because the victim was afraid of the defendant. This testimony directly negates the defendant's contention that the victim invited him over to her apartment that night.
Finally, the defendant failed to proffer any alternative defense that he would have offered if he had known about the photographs before trial. See, State v. Moore, 99-2684, pp. 12-13 (La.App. 4 Cir. 12/20/00), 777 So.2d 600, 608, writ denied, 01-365 (La.12/14/01), 803 So.2d 986.
In sum, we find that even without the erroneously introduced Polaroid photographs, the evidence forms an ample basis for the jury verdict. Accordingly, we find that the defendant has failed to show that he was prejudiced. This assignment of error lacks merit.
In his second assignment of error, defendant argues that the State failed to provide sufficient evidence to support the conviction for forcible rape because the State did not establish beyond a reasonable doubt that non-consensual sexual activity occurred.
In reviewing the sufficiency of the evidence, due process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Under Jackson, review of a criminal conviction record for sufficiency of evidence does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. A reviewing court is required to consider the whole record, and determine whether a rational trier of fact would have found guilt beyond a reasonable doubt. The actual trier of fact is presumed to have acted rationally until it appears otherwise. State v. Mussall, 523 So.2d 1305 (La.1988).
In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual finding. State v. Stec, 99-633, p. 4 (La.App. 5 Cir. 11/30/99), 749 So.2d 784, 787. The victim's testimony alone is sufficient to establish the elements of forcible rape, even in the absence of other physical evidence of rape. State v. Tapps, 02-547, p. 9 (La.App. 5 Cir. 10/29/02), 832 So.2d 995, 1001, writ denied, 02-2921 (La.4/21/03), 841 So.2d 789.
Forcible rape is defined by La. R.S. 14:42.1, in pertinent part, as:
[R]ape committed when the anal, oral, or vaginal sexual intercourse is deemed to be without the lawful consent of the victim because it is committed under any one or more of the following circumstances:

*856 (1) When the victim is prevented from resisting the act by force or threats of physical violence under circumstances where the victim reasonably believes that such resistance would not prevent the rape.
In support of his argument that the victim's testimony lacked credibility, the defendant asserts that the victim did not initially report the rape. Although the victim acknowledged that she did not say the word "rape" to the initial investigating officers, she testified that she told one of the police officers that the defendant had "made [her] have sex with him." The victim recounted that the scene was chaotic because there were several police officers at her apartment, the phones were ringing, and people were going in and out. She thought that, after the officers searched for the defendant, an officer would return to her apartment to complete the investigation and she could relate what had happened in a more private setting.
Moreover, Ms. McGarry, the victim's friend, testified that the victim called McGarry early that morning and reported to Ms. McGarry's boyfriend, who answered the phone, that she had been raped. Further, when Deputy Caravella responded, he remembered that the victim told him that she had been raped and she had reported this information to the officers who were at her apartment a few hours earlier. Finally, immediately after the defendant was apprehended, the victim was taken to the hospital by McGarry for a rape exam.
Although defendant asserts there was no evidence of force, Detective Cummings testified the mark on the victim's throat indicated the sexual intercourse was forced, not consensual. At trial, defendant testified that the mark on the victim's neck was from his son scratching the victim.
In this case, the victim's testimony and the defendant's testimony directly conflicted. The victim consistently testified that the defendant held her against her will, threatened to kill her if she did not comply with his demands, and raped her. The defendant contended that the victim invited him to her apartment and had consensual sex with him.
When faced with the conflict, the jury apparently chose to believe the victim. This is a credibility determination and it is not the function of the appellate court to evaluate the credibility of witnesses nor to overturn the trier of fact on its factual determination of guilt. State v. Gentras, 98-1095, p. 6 (La.App. 5 Cir. 3/30/99), 733 So.2d 113, 118, writ denied, 99-1302 (La.10/15/99), 748 So.2d 464. Based on the foregoing, our review of the whole record reveals that a rational trier of fact would have found that the State proved the elements of the crime of forcible rape beyond a reasonable doubt.
Finally, the record was reviewed for errors patent, according to La.C.Cr.P. art. 920. First, we note discrepancies between the minute entries and the transcript. First, the trial minute entry reflects that defendant was found guilty as charged on both counts. However, the transcript reflects that the defendant was only found guilty as charged on the forcible rape count, not both counts. Rather, the transcript reflects that defendant was found guilty of unauthorized entry of an inhabited dwelling, which is a responsive verdict to the charged offense of aggravated burglary.
Second, the commitment reflects that defendant was found guilty of an "amended charge 14:62.3." Again, the transcript does not reflect an amendment by the State. Rather, as noted above, the jury convicted the defendant of unauthorized entry of an inhabited dwelling, a violation of La. R.S. 14:62.3, which is a responsive verdict to the charged offense of aggravated burglary. In general, when *857 there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, we remand for the trial judge to correct the commitment and the trial minute entry to reflect that the defendant was convicted of the responsive verdict of unauthorized entry of an inhabited dwelling, a violation of La. R.S. 14:62.3.
Finally, we note that, at sentencing, the trial judge did not provide written notification to the defendant, who was convicted of a sex offense, of the registration requirements of La. R.S. 15:542, as required by La. R.S. 15:543(A). We remand in order for the trial court to inform defendant of the registration requirements in La. R.S. 15:542 by sending appropriate written notice to defendant within ten days of this opinion and to file written proof in the record that defendant received such notice. See, State v. Dickerson, 01-1287, pp. 16-17 (La.App. 5 Cir. 6/26/02), 822 So.2d 849, 859, writ denied, 02-2108 (La.2/21/03), 837 So.2d 627.
AFFIRMED; REMANDED FOR LA. R.S. 15:543 NOTIFICATION.
NOTES
[1] That same day, the Jefferson Parish District Attorney's Office also filed a separate bill of information charging defendant with false imprisonment (of the same victim) while armed with a dangerous weapon, in violation of La. R.S. 14:46.1. After trial, the jury found defendant guilty of false imprisonment, which is a misdemeanor. See La. R.S. 14:46. That conviction is not before this Court in this appeal. Further, in a third bill of information, defendant was charged with one count of stalking (La.14:40.2), three counts of violating a protective order (La.14:79), and two counts of making threatening phone calls (La.14:285). The trial judge heard the case with respect to these misdemeanor charges and found defendant guilty as charged on each count. These convictions are also not before this Court on appeal.
[2] See La.C.Cr.P. art. 814(A)(41).
[3] Although defendant prematurely filed his motion for appeal five days before he was sentenced, that prematurity was cured because his appeal was not granted until December 10, 2001, the day he was sentenced. State v. Hayes, 01-736 (La.App. 5 Cir. 12/26/01), 806 So.2d 816, 826, fn. 2, writ denied, 02-0263 (La.10/25/02), 827 So.2d 1169.
[4] La. R.S. 46:1844(W) provides, in part:

(1) In order to protect the identity and provide for the safety and welfare of crime victims who are ... victims of sex offenses, all public officials, ... including but not limited to ... judicial officers ... shall not publicly disclose the name, address, or identity of crime victims who ... are ... victims of sex offenses.
* * *
(2) For purposes of this Section, "sex offense" shall include the perpetration ... of forcible rape (R.S.14:42.1)....
[5] The victim explained that she believed that she had to obtain a court order to force the defendant to leave the apartment that they shared since his name was on the lease.
[6] Deputy Eddy identified the original crime scene photographs of the inside of the sliding glass door as well as the Polaroids. Deputy Eddy also testified that the pry marks on the exterior doorframe depicted in the Polaroids were present on the night of the incident and were consistent with forced entry.
[7] This Court denied the defendant's writ application on the basis that the defendant failed to make the required showing in the trial court. State v. Enclard, 01-1072 (La.App. 5 Cir. 10/4/01), unpublished writ disposition.
[8] During Mr. Wool's testimony, the defense objected to the use of the photographs on the basis that Mr. Wool did not actually take the photographs. After Mr. Wool's testimony, the State offered the photographs into evidence again. Over the defense's general objection, the court allowed the Polaroids into evidence.
[9] When a defendant is "lulled into misapprehension of the strength of the State's case" through the failure of the prosecution to timely or fully disclose and the defendant suffers prejudice, basic unfairness results which may constitute reversible error. State v. Harris, 00-3459, p. 8 (La.2/26/02), 812 So.2d 612, 617. However, the failure of the State to comply with the discovery procedure will not automatically result in reversal. Rather, the defendant must show prejudice before his conviction will be reversed. Id.
[10] Aggravated burglary, as defined, in pertinent part, by La. R.S. 14:60, is the "unauthorized entering of any inhabited dwelling ... with the intent to commit a felony or any theft therein, if the offender, (1) is armed with a dangerous weapon; or (2) after entering arms himself with a dangerous weapon; or (3) commits a battery upon any person while in such place, or in entering or leaving such place."