MARC E. JOHNSON, Judge.
1 ¡¿Defendant, Jose Manuel Licona, appeals his convictions and sentences for aggravated rape and sexual battery on the basis of trial court error denying his multiple motions for a mistrial. For the reasons that follow, we affirm his convictions and sentences.
Defendant was indicted by a Jefferson Parish Grand Jury on October 20, 2011, and charged with one count of aggravated rape of a juvenile under the age of 13 in violation of La. R.S. 14:42 and one count of sexual battery on the same juvenile in violation of La. R.S. 14:43.1. He pled not guilty and filed several pre-trial motions, including a motion to suppress his statements which was denied after a hearing. Defendant proceeded to trial on March 18, 2013. After a four-day trial, a twelve-person jury found Defendant guilty as charged on both counts. The trial court *337 sentenced Defendant to life imprisonment for the aggravated rape conviction and 50 years for the sexual battery conviction. Both sentences were ordered to be | ¡¡served without benefit of parole, probation or suspension of sentence and were ordered to run concurrently with each other.

FACTS

On the afternoon of July 10, 2011, J awoke from a nap and heard her five-year-old daughter, M, tell Defendant, J’s live-in boyfriend, that she was bleeding.[1] Upon putting M in the bathtub, J pulled down M’s pants and noticed she was bleeding. When J asked M why she was bleeding, M kept saying she did not know. J saw clots of blood coming out, at which time she and Defendant took M to East Jefferson General Hospital (EJGH). M was subsequently transferred from EJGH to Children’s Hospital via ambulance.
Once at Children’s Hospital, M was evaluated by Dr. Jamie Jackson, a forensic pediatrician with the Audrey Hepburn Care Center at Children’s Hospital. Dr. Jackson was called to consult on the case because of concerns for sexual abuse due to M’s unexplained vaginal bleeding. After obtaining M’s basic medical history from J, Dr. Jackson asked J and Defendant to leave the room so she could speak to M privately. When Dr. Jackson asked M what happened, M stated that her “dad” hurt her.[2] She told Dr. Jackson that her “dad” put his thing “here” and pointed to her front middle vaginal area and her butt. M also indicated that her “dad” played with her vaginal area with his finger. After Dr. Jackson talked to M, M was taken to surgery so her injuries could be fully assessed and evidence could be collected.
14Prior to surgery, M was examined by Dr. Kurt Eeg, a pediatric urologist. He noted that M had blood stains on her inner thighs, a clot where the vagina and urethra are located, and a small tear in the 7:00 position. In surgery, Dr. Eeg determined that M had a complete laceration, or a deep cut, along the entire length of her vagina and along the posterior wall of the vagina. Dr. Eeg believed he could see M’s bowels, indicating the tear went into M’s peritoneal cavity, and had to consult with a general surgeon on how to repair the injury. Both Dr. Jackson, who was present during the surgery to take photographs and collect evidence,[3] and Dr. Eeg testified that M’s injuries were consistent with penetrating trauma, such as penile/vaginal penetration.
At approximately 8:30 p.m., Officer Michael Jackson with the Kenner Police Department was dispatched to Children’s Hospital regarding a possible aggravated *338 rape.[4] After speaking with Dr. Jackson, Officer Jackson contacted his supervisor and then spoke with Detective Charlotte Synigal, who was assigned as the lead investigator on the ease. Pursuant to Det. Synigal’s instructions, Officer Jackson separated J and Defendant until Det. Synigal arrived.
Upon Det. Synigal’s arrival, Dr. Jackson gathered the Detective, J and a worker with child protective services, and disclosed what M had told her about what had happened. Det. Synigal then spoke with Defendant, who agreed to go to the police department to further discuss the matter. Thereafter, Det. Synigal was able to meet with M in the surgery recovery area, at which time M provided information consistent with that given by Dr. Jackson.
Early in the morning on July 11, 2011, Det. Synigal subsequently went to the police department, where she met with Defendant and advised him of his Rrights. Defendant waived his rights, and Det. Sy-nigal proceeded to interview him. During the interview, Defendant indicated that he and J were the only people who cared for M. He suggested to Det. Synigal that M might have caused the injury herself by inserting something into her vaginal cavity. According to Det. Synigal, when she told Defendant that M said he had vaginally and anally raped her and showed him Dr. Jackson’s report, Defendant “just kind of laughed and ... said that can’t be right, there has to be some other explanation for this.” When Det. Synigal specifically asked if M was lying, Defendant replied “no.” . Det. Synigal ended the interview once Defendant started laughing and she knew the interview would not progress any further. Defendant was subsequently arrested and transported to the jail.
Later that same day, Defendant agreed to talk with Det. Synigal, and gave two recorded statements. In his first statement, Defendant referred to M as his daughter. The statement was stopped shortly after it began when Defendant indicated he needed to use the restroom. After a break, Defendant gave a second statement in which he made inculpatory statements. Specifically, Defendant apologized for not previously telling the truth about the incident, asked God’s forgiveness for what he had done, admitted that he “must have been the person who did that to her,” that he must have done everything that M and the doctors said, and that he was there to “take responsibility” for what he had done.
Meanwhile, a search warrant had been obtained and was executed at the Kenner apartment where Defendant, J and M lived. Various items and clothing had been seized, including bloodied underwear. A day or two after the search, J called the police to report that she had found a t-shirt and a pair of men’s grey boxers balled up inside a towel in the laundry room. J stated these clothes belonged to Defendant. The police collected these items from the apartment and | (¡performed DNA testing on the boxers, which appeared to have blood stains on them.
The DNA test results showed that there was a mixture of more than one individual’s DNA on the boxer shorts. The DNA test results showed that M could not be excluded as a major donor to the DNA mixture, but Defendant was excluded as a possible donor. Further DNA testing, specifically an amplified test for Y chromosome testing, was conducted on the DNA mixture and revealed that Defendant and all males within his paternal lineage could *339 not be excluded as a possible donor of the DNA mixture found on the boxer shorts.
Ten days after the incident, on July 20, 2011, M was interviewed by Suzanne Jolis-saint, a forensic interviewer at the Jefferson Children’s Advocacy Center (CAC). This videotaped interview was played for the jury. During the interview, M stated that “Manuel” had hurt her and had put his “thing” in her “pee part” and “butt.” When asked to identify Defendant’s “thing” on a body diagram of an adult male, M circled the front middle part of male’s pants, between the legs. She also stated that “Manuel” put his finger in her “pee part.” She again circled the finger on the body diagram of the adult male. M further stated that “Manuel” licked her “pee part” with his tongue. M explained this happened in her mother’s bedroom on the bed while her mother was downstairs on the couch.
At trial, M, who was six years old, had great difficulty testifying. However, she was able to testify that she went to the hospital because she “got hurt.” She stated that she told the truth to the doctors at the hospital. M was shown the body diagrams from her CAC interview, and she explained that she circled the parts on the girl diagram where she was hurt. M identified Defendant in court as the person who hurt her.

JjISSUES

On appeal, Defendant, through counsel, raises four assignments of error, all of which relate to the trial court’s denial of several motions for mistrial made by Defendant throughout the course of the trial. Specifically, Defendant argues the trial court erred in denying his motions for mistrial when (1) he was compelled to appear before the jury venire during voir dire in his orange prison jumpsuit; (2) the prosecutor became so overcome with emotion during his opening statement that he was unable to continue without a recess in the proceedings; (3) a juror passed out after observing photographs of the victim’s injuries and Dr. Jackson rendered aid to the juror in the middle of her testimony; and (4) the trial court referred to the victim as a “protected person” who “should be treated accordingly” in front of the jury.
Additionally, Defendant filed a pro se supplemental brief asserting the trial court erred in not declaring a mistrial because of prejudicial illustrations regarding the crimes of which Defendant was accused which were used by the prosecutor during voir dire.

LAW & DISCUSSION

Motions for Mistrial — Standard of Review
A mistrial is a drastic remedy and, except in instances m which a mistrial is mandatory, is warranted only when trial error results in substantial prejudice to a defendant, depriving him of a reasonable expectation of a fair trial. Whether a mistrial should be granted is within the sound discretion of the trial court, and the denial of a motion for mistrial will not be disturbed absent an abuse of discretion. State v. Lagarde, 07-123 (La.App. 5 Cir. 5/29/07), 960 So.2d 1105, 1113-14, writ denied, 07-1650 (La.5/9/08), 980 So.2d 684.
| ^Louisiana Code of Criminal Procedure Article 775 provides for a mistrial when prejudicial conduct inside or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized under La.C.Cr.P. arts. 770[5] or *340 771.[6] A mistrial under Article 775 is discretionary and is warranted only when trial error results in substantial prejudice to the defendant depriving him of a reasonable expectation of a fair trial. State v. Davis, 07-544 (La.App. 5 Cir. 12/27/07), 975 So.2d 60, 68, writ denied, 08-380 (La.9/19/08); 992 So.2d 952.

Appearing Before the Jury Venire in Identifiable Prison Attire

Defendant first argues a mistrial was warranted when he was required to appear before the jury venire dressed in his orange prison jumpsuit. He maintains his constitutional presumption of innocence was gravely impinged by the jury seeing him in prison clothes prior to trial.
“Compelling a criminal defendant to stand trial in readily identifiable prison attire over his express objection infringes upon his presumption of innocence and denies the defendant due process of law.” State v. Spellman, 562 So.2d 455, 456 (La.1990), citing Estelle v. Williams, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976). The United States Supreme Court and the Louisiana Supreme Court have found the practice to be “inherently prejudicial” to the defendant in that the practice “threatens the ‘fairness of the factfinding process.’ ” Spellman, supra, quoting Estelle, supra. It is not the defendant’s presence at trial in prison garb that violates his right to a presumption of innocence, but rather it is being compelled to |9stand trial in prison clothes in the face of an objection by the defendant that violates his rights. State v. King, 00-2767 (La.App. 4 Cir. 8/22/01); 804 So.2d 57, 60, writ denied, 01-2794 (La.8/16/02); 822 So.2d 612. When a defendant objects to standing trial in identifiable prison attire before the jury has been impaneled, “[a] reasonable delay is appropriate to accommodate a defendant’s right to be tried in his own clothes.” Spellman, 562 So.2d at 456.
The record shows that there was a discussion between the parties on the Friday before the Monday trial date in which the importance of a 10:80 a.m. trial start time was stressed. The State indicated that it had a witness who was flying in to testify and had a tight travel schedule, thereby limiting his availability to testify. By 11:00 or 11:30 a.m. on the day trial was to begin, Defendant’s civilian clothes had yet to be produced. Nonetheless, the trial court ordered Defendant to be produced in the courtroom. Defendant was brought in wearing an orange jumpsuit, but no shackles. Thereafter, jury selection began. When Defendant was introduced to the jury venire, he remained seated at the defense table. The record shows Defendant appeared before the jury venire for 20-30 minutes, before his family arrived with his clothes. Thereafter, the court recessed for lunch. Upon court resuming after lunch, Defendant was dressed in civilian clothes for the remainder of jury selection and the entirety of trial.
*341 After lunch, at 2:07 p.m., Defendant moved for a mistrial on the basis the jury saw him in his orange prison jumpsuit. The trial court denied the motion and jury selection continued. Thereafter, at 3:55 p.m., the selected jurors were sworn as a panel. Trial concluded for the day and opening arguments began the next morning.
We first note that nothing in the record indicates Defendant objected to appearing before the jury venire in his prison attire. While the record indicates the | ^parties “had a conversation or two in chambers about it,” the substance of those conversations were not made a part of the record. Rather, the record only reflects that Defendant moved for a mistrial after he had changed into civilian clothes. Failure to make a timely objection negates the presence of compulsion required to establish a constitutional violation. See State v. Brown, 585 So.2d 1211, 1213 (La.1991), citing Estelle v. Williams, supra.
Nonetheless, even if Defendant had objected to appearing before the jury veni-re in his orange prison jumpsuit prior to the beginning of jury selection, we do not find that he was forced to stand trial while so dressed so as to violate his constitutional right to the presumption of innocence. Defendant appeared for a short period of time, 20-30 minutes, before the jury venire prior to a recess, during which time he was allowed to change into civilian clothes. For the remainder of jury selection that day and the entirety of the next three days of trial, Defendant was dressed in civilian clothes. Thus, there was no “constant reminder of the accused’s condition” that may have affeeted a juror’s judgment. Compare Brown, 585 So.2d at 1213.
Additionally, we note that the trial court had delayed the beginning of trial by two and one-half hours, presumably in an attempt to accommodate Defendant’s request for civilian clothing. However, despite the fact subpoenas were served on Defendant and his counsel four months before trial in November 2012 notifying them of the March 18, 2013 trial date and a 9:00 a.m. start time, Defendant was not prepared with civilian attire. Defendant had ample opportunity to obtain civilian clothing before his trial. We find that delaying trial until 11:00 or 11:30 a.m. when trial was noticed for 9:00 a.m.' gave Defendant reasonable opportunity to secure civilian clothing. A trial court is not expected to delay trial beyond a reasonable time to accommodate a defendant’s request for alternative clothing. See Spellman, 562 So.2d at 456. |nIn this case, any further delay would have prejudiced the State because of the limited availability of one of its witnesses, a situation which the State had previously made known to defense counsel and the trial court.
While the practice of a defendant standing trial in readily identifiable prison attire over his objection has been held to be “inherently prejudicial,” such practice is tolerated “where justified by an essential state interest specific to each trial.” Spellman, 562 So.2d. at 456, quoting Holbrook v. Flynn, 475 U.S. 560, 569-570, 106 S.Ct. 1340, 1345-46, 89 L.Ed.2d 525 (1986).
Based on the totality of circumstances in this case, we do not find Defendant’s constitutional presumption of innocence was violated when he briefly appeared before the jury venire wearing prison attire prior to changing into civilian clothes for the duration of the four-day trial. Specifically, we do not find Defendant was forced to stand trial in prison attire over his objection. We note that the courts have not gone so far as to prohibit a defendant from appearing before the jury in prison clothes under any circumstances. State v. Cleveland, 25,628 (La.App. 2 Cir. 1/19/94); 630 *342 So.2d 1365, 1369, citing State v. Newton, 562 So.2d 978 (La.App. 3rd Cir.1990). Emotions of Prosecutor
Defendant next asserts that the trial court erred in denying his motion for a mistrial when the prosecutor lost his composure and started crying during the State’s opening argument.
The record reflects that as soon as the prosecutor began his opening argument, Defendant moved for a mistrial, noting that the prosecutor was crying at the stand and there had been minutes of silence in front of the jury while the prosecutor attempted to compose himself. The trial court observed that it noted | ^“something was amiss” with the prosecutor as he approached the lectern.[7] Specifically, the trial court noted that “[the prosecutor] paused and it looked like he was becoming a little teary eyed.” The trial court further noted that within seconds after that and after the prosecutor took a sip of water, the parties approached the bench and Defendant moved for a mistrial. The trial court concluded the incident was not so prejudicial so as to warrant a mistrial and denied Defendant’s motion. The trial court further noted for the record that the prosecutor had his back to the jury the entire time of the bench conference. The prosecutor then indicated that he had composed himself and he proceeded to give his opening statement with no further emotional display noted in the record.
Courts have traditionally upheld the denial of a motion for mistrial based on emotional outbursts when a defendant fails to show their influence upon the jury prejudiced his right to a fair trial. State v. Chairs, 12-363 (La.App. 5 Cir. 12/27/12); 106 So.3d 1232, 1249, writ denied, 13-306 (La.6/21/13); 118 So.3d 413, citing State v. Clark, 02-1463 (La.6/27/03), 851 So.2d 1055, 1079 n. 25, cert. denied, 540 U.S. 1190, 124 S.Ct. 1433, 158 L.Ed.2d 98 (2004). The Louisiana Supreme Court has explained that courts “must credit the jurors with the good sense and fair-mindedness to see these outbursts for what they [are], the natural and irrelevant expression of human emotion, and not let the outbursts influence their decision.” State v. Wessinger, 98-1234 (La.5/28/99), 736 So.2d 162, 183, cert. denied, 528 U.S. 1050, 120 S.Ct. 589,145 L.Ed.2d 489 (1999).
Defendant argues that prejudice was likely by the emotional display by a “respected and experienced prosecutor himself who was so disturbed by the mention of the case,” but fails to demonstrate that the emotional display had any effect on the jury so as to prejudice his right to a fair trial. The record shows the | ^prosecutor became teary-eyed when he commenced his opening statement. After a brief period, the prosecutor composed himself and continued his opening statement. There is no indication there was any additional emotional display by the prosecutor throughout the remainder of the three days of trial. Additionally, the trial court instructed the jury that they were not to be influenced by sympathy, passion, prejudice, or public opinion, and that they were “to base [their] verdict solely upon the evidence, without prejudice or sympathy.” The trial court further instructed the jury that the opening statements of counsel were not to be considered as evidence.
Because Defendant does not demonstrate, and the record does not indicate, how the prosecutor’s display of emotion could have prejudiced him to such a degree that a mistrial was warranted, we *343 find no abuse of the trial court’s discretion in denying Defendant’s request for a mistrial on this ground.

Emergency Medical Aid Rendered by Witness to Juror

Defendant also asserts the trial court erred in denying a mistrial when a juror passed out after viewing graphic photographs of the victim’s injuries, and Dr. Jackson left the witness stand to render aid to the juror. Defendant contends a mistrial was warranted because these occurrences made it impossible for him to obtain a fair trial. He argues that the actions of Dr. Jackson in rendering aid to a juror in need caused the jury to develop a greater respect for Dr. Jackson, giving the State an unfair advantage and preventing Defendant from getting a fair trial.
During Dr. Jackson’s testimony, the State displayed two photographs of the victim’s injuries. The first photograph showed the victim’s genital, perineum and anal area prior to any manipulation or surgery. The blood clot that had been previously testified about was visible in the photograph. The second photograph was also of the victim’s genital area and showed the full extent of her injuries, | ^including the tear along the entire length of the vagina. Shortly after Dr. Jackson explained the photographs, a juror passed out.
Within seconds after the juror became unconscious, another juror, who was a nurse, rendered assistance. When someone announced the juror was not breathing, Dr. Jackson left the witness stand, ran over to the juror, and rendered aid by holding his head and checking for a pulse. Emergency Medical Services (EMS) subsequently arrived and tended to the ailing juror, at which time Dr. Jackson left the courtroom. After the juror regained consciousness, he explained to the trial court that he was not very good with blood, he started feeling a little lightheaded after the last picture, and then he passed out. After stating his desire to be excused from the jury, the juror was replaced with an alternate.
Thereafter, Defendant moved for a mistrial under La.C.Cr.P. art. 775. The trial court denied the motion, stating that while a remarkable event occurred, nothing more transpired than a witness, who was a doctor acting by a moral and professional mandate and was a Samaritan with certain skills, rendering aid. The trial court noted that no words were exchanged between the witness and the juror and that the witness exited the courtroom upon the arrival of emergency services.
Even if a mistrial was warranted under Article 775, the failure to grant a mistrial does not result in an automatic reversal of a defendant’s conviction, but would be trial error subject to the harmless error analysis. State v. Campbell, 13-130 (La.App. 5 Cir. 10/30/13); 128 So.3d 1137, 1142. Trial error is harmless where the verdict rendered is “surely unattributable to the error.” Id.
Defendant’s main argument on appeal is that Dr. Jackson’s credibility was elevated in the eyes of the jury by the fact she rendered aid to the ill juror. We disagree. Dr. Jackson’s credentials as a doctor had already been established. The fact she rendered aid in a medical emergency is nothing more than what is | ^expected from a doctor. Accordingly, we do not find Dr. Jackson’s credibility was elevated by her reaction to an emergency situation.
Further, we note that Dr. Jackson’s credibility was bolstered by the corroboration of her testimony by other evidence. In addition to Dr. Jackson’s testimony, the State presented testimony of the victim through her CAC interview and her live testimony at trial. In her testimony, the *344 victim stated that Defendant had hurt her and identified Defendant in court as the person who had hurt her. She described how Defendant had put his “thing” in her “pee part” and her “butt.” Detective Syni-gal testified that she was able to speak with the victim after surgery, and the victim provided her with information consistent with what Dr. Jackson had told Detective Synigal. Additionally, Dr. Eeg, who performed the surgery, testified regarding the victim’s injuries and stated how her injuries were consistent with penile/vaginal penetration. Furthermore, Defendant admitted in his statement that he had “done everything that M and the doctors said.”
Based on this overwhelming evidence of Defendant’s guilt, any error in failing to grant a mistrial under the circumstances was harmless. Specifically, we find that Dr. Jackson’s act of briefly rendering aid to a juror in the midst of a medical emergency by holding his head and checking his pulse was surely unattributable to the guilty verdict in light of the overwhelming evidence of Defendant’s guilt.
Reference to Victim as a “Protected Person”
Defendant further contends a mistrial was warranted when the trial court referred to the victim as a “protected person” who “should be treated accordingly,” and specifically noted the admonition applied to the defense. Defendant argues that this was an improper comment on the evidence, which bolstered the victim’s credibility and warned against Defendant’s exercise of his right of confrontation.
11fiWhen M was called to testify at trial, she had an extremely difficult time. She initially did not answer any questions posed to her. After a bench conference, the prosecutor was allowed to kneel next to M, who was crying, with a handheld microphone in an attempt to elicit M’s testimony. Upon Defendant’s objection to the situation, a 15-minute recess was taken, during which time Defendant moved for a mistrial. The trial court denied the mistrial, finding M’s emotional display did not warrant a mistrial. The court noted M’s young age and her designation as a protected person by the legislature for purposes of live feed testimony under La. R.S. 15:283.[8] The trial court stated that it would resort to such technology if needed. Thereafter, the State advised that M was willing and ready to testify. When court reconvened, the trial court stated, “I remind the State once again this is a protected person, she should be treated accordingly.” The trial court then stated, “That references [sic] to the defense also, as defined by statute,” warranting another motion for a mistrial by Defendant, who claimed the label brought M to a different level as a witness than other witnesses who had testified in the case. The trial court denied the mistrial.
Under La.C.Cr.P. art. 772, a judge shall not comment upon the facts of the case, the testimony of any witness, or give an opinion as to what has been proven, not proven, or refuted. We do not find the trial court’s reference to the victim as a “protected person” was an improper comment on the evidence or an expression of the trial judge’s opinion as it was an accurate statement of the law. We further find any error in referring to M as a *345 “protected person” was harmless in light of the [^overwhelming evidence of Defendant’s guilt, i.e., his confession and the physical evidence.
To the extent Defendant argues that the reference to the victim as a “protected person” was a threat against his right to confrontation, we find Defendant failed to raise this argument in the trial court and, thus, is precluded from raising it for the first time on appeal. See La. C.Cr.P. art. 841; State v. Snyder, 12-896 (La.App. 5 Cir. 10/9/13); 128 So.3d 370, 382-83 (“A new .basis for a claim, even if it would be meritorious, cannot be raised for the first time on appeal.”).[9]

Prejudicial Illustrations during Voir Dire

In his pro se supplemental brief, Defendant argues that the prosecutor’s “prejudicial illustration” to the jury about the charged offenses during voir dire warranted a mistrial.
To preserve the right to appellate review of an alleged trial court error, a party must state a contemporaneous objection with the occurrence of the alleged error as well as the grounds for the objection. La.C.Cr.P. art. 841(A); State v. Enclard, 03-283 (La.App. 5 Cir.6/19/03); 850 So.2d 845, 853. The purpose behind the contemporaneous objection rule is to put the trial court on notice of an alleged irregularity so that it may cure the problem. It is also intended to prevent the Defendant from gambling for a favorable verdict and then resorting to appeal on errors that might have easily been corrected by an objection. Id.
The record does not reflect any objection by Defendant to any of the remarks upon which Defendant bases this assignment of error. Accordingly, because 118Pefendant failed to object to the comments at issue and failed to move for a mistrial at that time, we find the issue has not been properly preserved for review on appeal.

ERRORS PATENT

We have reviewed the record for errors patent in accordance with La. C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); and State v. Weiland, 556 So.2d 175 (La.App. 5th Cir.1990), and note errors in the State of Louisiana Uniform Commitment Order that require correction. Specifically, the Uniform Commitment Order in the record incorrectly shows the date of the charged offenses as July 11, 2011, when the actual date of the offenses as alleged in the indictment and proven at trial was July 10, 2011. Additionally, the Order incorrectly reflects that Defendant was adjudicated on April 22, 2013, when he was actually adjudicated on March 21, 2013.[10]
Accordingly, we remand this case for correction of the Uniform Commitment Order to accurately reflect that the date of the offense was July 10, 2011 and that Defendant was adjudicated on March 21, 2013. After correction, the Clerk of Court *346 for the 24th Judicial District Court is ordered to transmit the Uniform Commitment Order to the officer in charge of the institution to which Defendant has been sentenced and the Department of Correction’s Legal Department. See La.C.Cr.P. art. 892(B)(2); State ex rel. Roland v. State, 06-244 (La.9/15/06); 937 So.2d 846 (per curiam); State v. Long, 12-184 (La.App. 5 Cir. 12/11/12); 106 So.3d 1136, 1142.

DECREE

Defendant’s convictions and sentences for aggravated rape and sexual battery are affirmed. We find no reversible error in the trial court’s denial of | ^Defendant’s motions for mistrial. This matter is remanded to the trial court for correction of the Uniform Commitment Order as noted above.

CONVICTIONS AND SENTENCES AFFIRMED; REMANDED FOR CORRECTION OF THE COMMITMENT.

.Initials are used under the authority of La. R.S. 46:1844(W)(3), which allows the Court to identify a crime victim who is a minor or a victim of a sex offense by using his or her initials. Further, this Court has adopted a policy that this Court’s published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim’s identity (i.e., parent, sibling, or relative with the same last name as the victim). See State v. E.J.M. III, 12-774 (La.App. 5 Cir. 5/23/13); 119 So.3d 648, 652, n. 1. Compare State v. R.W.B., 12-453 (La.12/4/12); 105 So.3d 54.

. J testified that M started calling Defendant "Daddy” after her 10-month-old daughter that she had with Defendant was born. J clarified that Defendant is not M's biological father.

. No DNA was identified from the rape kit. Dr. Jackson gave possible explanations for the lack of DNA, citing the extensive amount of bleeding, the wiping of the blood, the fact M had urinated since the incident, and the fact M had been put into a bath after the incident and prior to the collection of evidence.

. Defendant lived with J and M in an apartment located in Kenner.

. La.C.Cr.P. art. 770 mandates a mistrial upon motion of a defendant when the judge, district attorney, or a court official makes a remark or comment within the hearing of the *340 jury during trial that refers directly or indirectly to (1) race, religion, color or national origin if the remark is irrelevant and might create prejudice against the defendant in the mind of the jury; (2) inadmissible other crimes committed or alleged to have been committed by the defendant; (3) the failure of the defendant to testify in his own defense; or (4) the refusal of the judge to direct a verdict.

. La.C.Cr.P. art. 771 provides that the trial court may grant a mistrial, if an admonition is insufficient to assure the defendant a fair trial, when an irrelevant remark or comment made during trial is of such a nature that might create prejudice against the defendant or the State in the mind of the jury when the comment is made by (1) the judge, district attorney, or a court official and is not within the scope of Article 770; or (2) a witness or person other than the judge, district attorney, or a court official, regardless of whether the comment is within the scope of Article 770.

. The trial court noted that the prosecutor was his regular prosecutor who the court saw quite often.

. La. R.S. 15:283(A) provides that a court “may order that the testimony of a protected person who may have been a ... victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury” when the court makes a finding of necessity based on certain circumstances. A “protected person” is defined as a victim of crime who is under the age of 17. La. R.S. 15:283(E)(1).

. See also State v. Winfrey, 97-427 (La.App. 5 Cir. 10/28/97); 703 So.2d 63, 77, writ denied, 98-264 (La.6/19/98); 719 So.2d 481. In Winfrey, the defendant argued on appeal that the trial court had allowed the prosecutor to go beyond the scope of cross-examination on redirect. He also argued on appeal that the testimony was based on inadmissible hearsay. This Court found that the defendant had not raised the issue of redirect testimony exceeding the scope of cross-examination at trial but only argued the testimony was based on hearsay. Because a new basis for an objection may not be raised for the first time on appeal, this Court limited its analysis to the issue of hearsay.

. The record shows Defendant was sentenced, not adjudicated, on April 22, 2013.